**Page 6**

1  A  You now what, I don't really know. It
2  started -- it's been a long relationship.
3  Q  When do you believe the relationship
4  started, at the outset of Aries Capital or
5  thereafter?
6  A  I'm sorry, can you?
7  Q  When did the relationship with Asta
8  Funding start? Was it when you started Aries or
9  afterwards?
10  A  I believe it was originally in 2003. And
11  then, but --
12  Q  You indicated you started Aries Capital in
13  '05?
14  A  Correct, so to answer that question,
15  that's when I became owner, yes.
16  Q  You became the owner of Aries Capital in
17  '03?
18  A  Correct. No, '05. '05.
19  Q  When did you first become employed or
20  connected with Aries Capital?
21  A  I believe it was 1999 or 2000. We're
22  talking 20 years ago.
23  Q  I understand. What was your initial
24  position with Aries Capital?
25  A  Basically, operations.

**Page 7**

1  Q  You remained in that position until you
2  became an owner?
3  A  Correct.
4  Q  What were the circumstances of your first
5  involvement with Asta Funding?
6  A  Basically my business partner at the time
7  brought them in and I just did the administration to
8  close the paperwork. And I believe that was around
9  2008. But I don't know.
10  Q  Who was your business partner at the time
11  to which you refer?
12  A  Harvey Lee Wind.
13  Q  Could you spell his name?
14  A  Harvey Lee Wind, my mentor.
15  Q  Harvey Lee, I'm sorry I didn't catch the
16  last name.
17  A  Wind.
18  Q  Could you spell that?
19  A  W-I-N-D, like the wind. Blow like the
20  wind.
21  Q  He was the first person to contact Asta
22  Funding?
23  A  Correct. Then we did it together.
24  Q  Have you ever pet people from Asta
25  Funding?

**Page 8**

1  A  Yes.
2  Q  With whom have you dealt with at Asta
3  Funding?
4  A  Various contacts that have come and gone.
5  Q  Can you name any of them?
6  A  Well, our main contact was Lori Smith.
7  And then now we -- Gary Stern is the owner. I dealt
8  with his father and his son. Gentleman by the way.
9  And then -- but our direct reports were various
10  employees, you know, through the course that came
11  and left.
12  Q  How many people does Aries Capital employ?
13  A  We're about 19, including subcontractors.
14  They're 1099 employees. I call them subcontractors.
15  We're talking the same thing.
16  Q  Who is responsible for the relationship
17  with Asta Funding?
18  A  Right now it's basically me.
19     MR. EDELMAN: I'd like the court reporter
20  to show the witness what has been marked as
21  Exhibit 5.
22     (Exhibit 5 marked for identification and
23  handed to the witness.)
24  A  That's a normal pleading with James
25  Ciesniewski and Darryl Norman, who I don't know of.

**Page 9**

1  It names plaintiff defendants.
2  Q  I just wanted you to turn to pages PAL001
3  through 12. It's about a quarter inch in.
4     MR. VELDE: Dan, can we identify what that
5  document is?
6     MR. EDELMAN: Exhibit 5 is Defendants'
7  Responses to Plaintiffs' First Discovery
8  Requests.
9  Q  And the first attached document is
10  entitled Attorney Network Collection Agreement.
11     MR. VELDE: Thank you, Dan.
12  A  No, I don't have that. I'm looking at 11
13  to 12. Hold on. My answer is no, this isn't the
14  document.
15     MR. BOYLE: At the end of the answers.
16     MR. POLSBY: It's attachments to
17  Exhibit 5.
18     MR. BOYLE: So it should be coming up
19  right after the signatures.
20  A  Okay. What are your questions on that?
21  Q  Do you recognize the Attorney Network
22  Collection Agreement?
23     MR. POLSBY: We're not in the right place.
24  He's talking abut the Attorney Network
25  Collection Agreement, PAL001.

Page 10

1  A   Is that the Parker Moss?
2  Q   No this is --
3  A   Palisades, right.
4  Q   -- Attorney Network Collection Agreement
5  between Palisades Collection and Aries Capital
6  Partners.
7  A   What pages, sir?
8  Q   PAL0001, and it says Exhibit page 99 in
9  the left-hand corner.
10 A   Okay.
11 Q   Do you have it in front of you, the
12 Attorney Network Collection Agreement?
13 A   Correct.
14 Q   Did you sign that on page PAL000012?
15 A   Yes, that's my signature.
16 Q   You signed as vice president?
17 A   Correct.
18 Q   Who was president at the time?
19 A   His name is Lee Wind.
20 Q   Do you recognize the person that signed
21 for Palisades Collection?
22 A   Yeah.
23 Q   Cameron Williams.
24 A   Gary.  That's Gary.  It says Gary on
25 there.  He's no longer with the company.  He was the

Page 11

1  intern CFO, another gentleman.
2  Q   Is the date on the first page PAL000001
3  January 15, 2009?
4  A   I'm sorry, the first page?  I don't want
5  -- I don't have readers.
6  Q   Yes, of the Attorney Network Collection
7  Agreement?
8      MR. BOYLE:  It's at the top.
9  A   I don't know what that says.  Oh, yes,
10 it's 2009.  January something of 2008.  Is that
11 eight or nine?
12 Q   Was there a prior --
13     (Cross-talk.)
14     MR. BOYLE:  For the record, this is John
15  Boyle, the witness apparently forgot his
16  reading glasses so he's having difficulty
17  reading.
18 A   But I can't see it, even if I had my
19 readers I couldn't see that.  It's 2009 or 2008.
20 It's January definitely.
21 Q   Was this the only attorney network
22 collection agreement that Aries had with Palisades
23 Collection?
24 A   This is our main one, yes.
25 Q   Was there a prior version or agreement?

Page 12

1  A   No, nope.  In 2003 we just got a
2  placement.  There was no agreement.  It was a basic,
3  who knows.  I mean that's past the statute anyway.
4  Q   Was there some occasion or event that
5  caused the execution of this attorney network
6  collection agreement?
7  A   Yeah, placements of judgment.
8  Q   Was there an increase in the volume of
9  judgments that you were obtaining from Asta Funding
10 in early 2009?
11 A   It was pretty consistent, sure.
12 Q   What do you mean by "pretty consistent?"
13 After 2009 or before?
14 A   Well they -- no after, after.
15 Q   For how long did Palisades Collection
16 continue to place judgments with Aries Capital for
17 collection?
18 A   I mean I can't give you specifics but we
19 have a long standing relationship, sure.
20 Q   Until now or until very recently?
21 A   Relatively recently, yes.  The last
22 placement I wouldn't know.
23 Q   Did you have a discussion with somebody at
24 Asta Funding or Palisades Collection as to the
25 source of the judgments that you got after 2009?

Page 13

1  A   Of course.  We have the original attorney
2  name, okay.  And if it was substituted in, sure.
3  And then we took that and that judgment and placed
4  it with various attorneys.
5  Q   Did you have a network of attorneys prior
6  to January of 2009?
7  A   Mostly in New York.
8  Q   Prior to early 2009 had you done any work
9  collecting judgments in Indiana?
10 A   I don't know.  I really don't know.
11 Q   Does the name Wolpoff & Abramson mean
12 anything to you?
13 A   Yeah, yeah.
14 Q   What does it mean to you?
15 A   They were a law firm.  They're in
16 Maryland.  Stuart Wolpoff, he was a buyer.  And then
17 they -- I think they sold out from what I
18 understand.  So they were the buyer.
19 Q   When you say that Stuart was "a buyer,"
20 was he buyer of debts?
21 A   Correct.
22 Q   Did Stuart Wolpoff have anything to do
23 with the judgments that you began collecting from
24 Palisades Collection in early 2009?
25     MR. POLSBY:  I'm going to object to

Page 14

1  foundation on that.  Answer the question if you
2  can.
3     A   I know that it's no longer in business.
4  That's all I can tell you.  I know he went into the
5  banking industry.  He wasn't an attorney.  His
6  father was.
7     Q   Does the name Palisades Acquisition mean
8  anything to you?
9     A   Yeah, they're the buying entity.  Just
10 like any bank --
11        (Cross-talk.)
12    A   Just like any bank would buy out another
13 bank.
14    Q   I'm sorry, who bought out who?
15    A   Don't know.
16    Q   But you're familiar with a buying entity
17 called Palisades Acquisition, usually with a number
18 after it?
19    A   Correct.
20    Q   Do you know what the connection is between
21 Palisades Collection and the Palisades Acquisition
22 entity?
23        MR. POLSBY:  I'm going to object to
24    foundation.  Answer that if you can, please.
25    A   Rephrase the question, please.

Page 15

1     Q   Do you know if there is a connection
2  between Palisades Collection and any of the
3  Palisades Acquisitions entities?
4         MR. POLSBY:  Same objection.
5     A   Yeah, I would have to go with counsel on
6  that one.  I don't know.  I really don't.
7     Q   You don't know is a perfectly acceptable
8  answer if that's correct.
9         Do you know if there's any connection
10 between Palisades Collection and Asta Funding?
11        MR. POLSBY:  Same objection.  Foundation.
12     Answer that if you can.
13    A   I know that Asta is a public company and
14 used to raise financing.
15    Q   Do you know what Palisades Collection has
16 to do with it, if anything?
17    A   Buying entity.
18    Q   Is there also a connection between
19 Palisades Acquisition and Asta Funding?
20        MR. POLSBY:  Objection to foundation.
21     Answer if you can.
22    A   I'm sorry, say that again.
23    Q   Do you know if there is any connection
24 between Palisades Acquisition and Asta Funding?
25        MR. POLSBY:  Same objection.

Page 16

1     A   Different companies.
2         (Cross-talk.)
3     A   Different corporate companies.
4     Q   I'm sorry, you broke up.
5     A   They're different corporations.
6     Q   Is there somebody that you deal with at
7  the Palisades Acquisition entities?
8     A   No.
9     Q   If you're collecting a debt for one of the
10 Palisades Acquisition entities who would you deal
11 with?
12    A   Right now?  Well, it changed.
13    Q   Or in the past.
14    A   In the past there were various.  But right
15 now we're dealing with a main contact there.
16    Q   Do you know the name of the main contact?
17    A   Yea, you're deposing her.  Her name is
18 Lori Smith.
19    Q   Did you deal with Lorry Smith for
20 Palisades Collection or Palisades Acquisitions, or
21 both?
22    A   Various, various portfolio.  But never
23 Asta Funding I believe.  I don't know.  Might have
24 been one or two in there.
25    Q   Do you know who Lorry Smith works for?

Page 17

1     A   No.  Either Asta Funding or Palisades.
2  I'm not sure.  I don't know how she's paid.
3     Q   After you started getting judgments from
4  Palisades Collection to collect how is information
5  furnished to Aries Capital?
6     A   Through various spreadsheets and usually
7  through a link that was secured.
8     Q   Was there some software that was
9  associated with the link?
10    A   I believe we tie into their system with
11 various passwords that changed due to security.  And
12 then we download it in our system.  And we have
13 security procedures in place.
14    Q   What kind of software does Aries Capital
15 use?
16    A   It's called C-Pro.
17    Q   Could you spell that?
18    A   C-P-R-O.
19    Q   Does it stand for something?
20    A   Collector Pro.
21    Q   When you got spreadsheets of judgments
22 from Palisades Collection what did you do with them?
23    A   They were more TXT files.  They weren't
24 spreadsheets.  I retract that one.  They were TXT
25 files, which we had to cull into data and put it

Page 62

 1    handed to the witness.)
 2        MR. EDELMAN: This is the plaintiff
 3    servicing agreement.
 4    A   Okay.
 5    Q   Have you ever seen this document before?
 6    A   I believe so.
 7    Q   Do you recall under what circumstances you
 8    saw it?
 9    A   Our initial due diligence process.
10        MR. EDELMAN: Could the court reporter
11    show the witness what has been marked as
12    Exhibit 2.
13        (Exhibit 2 marked for identification and
14    handed to the witness.)
15    A   Okay.
16    Q   Have you ever seen this document before?
17    A   I don't remember. It's old it looks like.
18        MR. EDELMAN: Let me take a few minutes
19    and see what I have left.
20        (Short recess.)
21    Q   Does Aries Capital have any manuals that
22    it uses in its business?
23    A   I'd have to check.
24    Q   When people from Asta Funding or Palisades
25    Collection visited Aries Capital, did they provide

Page 63

 1    any reports of what they observed during their
 2    visit?
 3    A   No. We were just audited.
 4    Q   You didn't get the results of the audit or
 5    report?
 6    A   I didn't.
 7    Q   Do you know if anybody else at Aries
 8    Capital did?
 9    A   I'd have to check.
10    Q   Who would you check with to find something
11    like that out?
12    A   I'd have to check.
13        MR. EDELMAN: I'd like the reporter to
14    show the witness what been marked as Exhibit
15    27.
16        (Exhibit 27 marked for identification and
17    handed to the witness.)
18    A   Okay.
19    Q   Taking a look at Exhibit 27, is a Great
20    Seneca file handled by an Indianapolis law firm
21    called Bleecker Brodey & Andrews. Is there any way
22    you could determine whether this was a file that
23    Aries Capital was involved with?
24        MR. POLSBY: Object to foundation on that.
25    A   My attorney objected to that.

Page 64

 1        MR. POLSBY: Answer if you can.
 2    A   I have no idea, no. No idea.
 3    Q   Do you have some kind of an index of all
 4    the law firms that have been part of the attorney
 5    network?
 6    A   My attorney network?
 7    Q   Yes.
 8    A   I do.
 9    Q   Aries Capital's?
10        MR. POLSBY: Did you answer that?
11    A   I do.
12    Q   In what form is this index?
13    A   I could give it to you in data, but it
14    needs to come to you securely if you have a website
15    that's encrypted.
16        MR. POLSBY: Before you agree to hand that
17    over we have an objection pending on that issue
18    and the Court has not ruled on whether that's
19    discoverable yet.
20    Q   But it exists. Are attorneys who are in
21    the network ever contacted by title insurance
22    companies with respect to judgments against people?
23    A   I believe so. It is outsourced.
24    Q   When you it's outsourced, is there
25    somebody who is in charge of handling inquires from

Page 65

 1    a title insurance company that would like to know
 2    what it takes to get a judgment off of somebody's
 3    title?
 4    A   That's usually pro forma.
 5    Q   Who handles it?
 6    A   The attorney.
 7    Q   The network attorney such as Parker Moss?
 8    A   Correct.
 9    Q   Does Aries Capital ever communicate with
10    the title company?
11    A   It would be referred out. Yeah, it would
12    be referred out.
13    Q   To the network attorney?
14    A   Correct.
15    Q   Are network attorneys ever told to file
16    appearances in cases without taking action to
17    proceed with the enforcement of judgment?
18    A   Whatever's statutory in that state.
19    Q   I'm sorry, whatever is statutory?
20    A   Yeah, statutory. Your normal procedure
21    before doing an execution or lien.
22    Q   So you just tell the local attorney to do
23    whatever local procedure calls for?
24    A   Correct, because each state is different.
25    Q   Other than what you've testified to do you

Page 66

 1  provide any other instructions to your network
 2  attorney?
 3     A   Yeah, to do their job.
 4     Q   Nothing more specific?
 5     A   Just to see how their liquidation rates
 6  are in the collection business.
 7     Q   How does Aries Capital keep track of
 8  liquidation rates of each local attorney --
 9     A   We go month to month.  And it's a monthly
10  remittance.  And we send it out -- our New York
11  attorney handles sending out the funds.
12     Q   The New York attorney is Houselanger?
13     A   Correct.
14     Q   Do you have a spreadsheet or a program
15  that Aries Capital uses to monitor the liquidation
16  rates of network attorneys?
17     A   No.  I eyeball it.
18     Q   So you have the monthly remittances and
19  you compare it to what, the placements?
20     A   Yes.  But there's no system.
21     Q   Do you recall any communications with Levy
22  & Associates or Kara Graham with respect to
23  inquiries from title companies?
24     A   I don't recall.
25     Q   Do you know what portion of the judgments

Page 67

 1  that Aries Capital places with network attorneys are
 2  resolved with the result of title company activity?
 3     A   I really don't know.
 4     Q   Is an inquiry from a title company
 5  something that's common or unusual?
 6     A   Very unusual.
 7        MR. EDELMAN:  I do not have any other
 8     questions.
 9        MR. VELDE:  Can we take a five minute
10     break, I want to look at some documents.
11        (Short recess.)
12  BY MR. VELDE:
13     Q   Mr. Blake, my name is Peter Velde.  I
14  represent Parker Moss, P.C. and Parker Moss.
15        MR. VELDE:  Dan, could you get to Exhibit
16     13, the spreadsheet here that we were talking
17     about.
18        (Exhibit 13 in front of witness.)
19     Q   Now previously you testified this would
20  have been the information that you would have
21  received from the Palisades entities; is that
22  correct?
23     A   Correct.
24     Q   And then is this information, after you do
25  your clean up, is what is sent to Parker Moss?

Page 68

 1     A   Yeah, we clean it up a little bit and send
 2  it over.
 3     Q   As I look at the first page it has the
 4  Plaintiff's name, it has Centurion Capital; is that
 5  correct?
 6     A   In that case, yes.
 7     Q   It also gives of the cause number and it
 8  gives the court name; is that correct?
 9     A   Correct.
10     Q   Then it gives the original creditor, in
11  that is Discover Financial Services?  You can go
12  ahead and look at the document and follow along.
13     A   It would be Discover.
14     Q   Then it has Mr. Ciesniewski's name?
15     A   Correct.
16     Q   It has his address and it has his place of
17  employment; is that correct?
18     A   Correct.
19     Q   Nowhere in that document with respect to
20  Mr. Ciesniewski is there any indication that
21  Palisades is the owner of the judgment at that point
22  in time; is that correct?
23     A   No, we provided it.
24     Q   How did you provide it to Mr. Moss?
25     A   Through data format.

Page 69

 1     Q   That would have been this piece of paper?
 2     A   Correct.
 3     Q   And nowhere --
 4     A   No, not this piece of paper.  This is the
 5  original placement data.
 6     Q   To Mr. Moss, right?
 7     A   -- call data -- no, this is not.  I don't
 8  believe this is the data.  Hold on.  Was this
 9  provided by us, do you know?  Because it looks like
10  a spreadsheet.  I don't know.  I really don't.
11     Q   If you go to the page that's marked at the
12  lower left-hand corner 00038.
13     A   Thirty-eight, I got it.
14     Q   That pertains to Mr. Norman, does it not?
15     A   I'm sorry, 00038.
16        MR. POLSBY: 00038.
17     A   A Mr. Norman?
18     Q   Darryl D. Norman?
19     A   I don't see that on this piece of paper.
20        MR. POLSBY: Right here.
21     A   Oh, okay, yes.
22     Q   It shows that the original creditor in
23  that was Providian Bank; is that correct?
24     A   Right, correct.
25     Q   If you go down, the plaintiff's name in

Page 70

1  that case, if you go to the next couple of pages,
2  like 00040, is Great Seneca; is that correct?
3     A   Yes.
4     Q   Again, with respect to Mr. Norman there is
5  nothing on this document that shows that Palisades
6  or any of the Palisades entities own the debt that
7  was owing by Mr. Norman; is that correct?
8     A   If this was the original placement?
9     Q   If it was, I'm asking you the question.
10    A   It doesn't say that.
11    Q   It doesn't say it at all?
12    A   Not in this paperwork.  However we always
13  put on the original assignee.  I mean the current
14  creditor.  Is there a current creditor on there?
15  It's a plaintiff name.  Okay, any other questions?
16    Q   So there's no current creditor on that, is
17  there, on that document?
18    A   Correct.
19    Q   After Mr. Ciesniewski was represented by
20  counsel did Parker Moss request assignment of
21  judgments from your company?
22    A   I believe so.
23        MR. VELDE: Now I'm going to hand you
24     what's been marked, I think it's Exhibit 14.
25     You should have it over here.

Page 71

1       (Exhibit 14 marked for identification and
2    handed to the witness.)
3     Q   I'm going to ask you if you can identify
4  those documents.
5     A   Yeah, it's the assignment of the
6  judgments.  Palisades Acquisition XV and going to
7  Centurion Capital, going to Palisades XV.
8     Q   Do you know whether this was the document
9  that was provided to Mr. Moss?
10    A   I believe so.
11    Q   If you went back and looked at your
12  records would that document have been provided to
13  Mr. Moss on or about the 26th of August of 2015, if
14  you can recall?
15    A   I didn't see if I have -- oh, we tried to
16  look for it yesterday by the way.
17        MR. POLSBY: Hold on.  There's no question
18     pending right now.
19        MR. VELDE: I have no other questions.
20  BY MR. BOYLE:
21    Q   Mr. Blake, my name is John Boyle.  I
22  represent Asta Funding and the two Palisades
23  defendants.
24    A   Uh-huh.
25    Q   I just have a handful of questions just to

Page 72

1  try to get a little clarity on the things you
2  testified about earlier today.
3     A   Okay.
4     Q   You talked about there being quarterly
5  audits?
6     A   Uh-huh.
7     Q   Is that right?
8     A   Yes.
9     Q   Where representatives of Asta, Palisades
10  would come to your office and conduct an audit; is
11  that right?
12    A   Yes.
13    Q   What was the purpose of those audits?
14    A   Usually just general cases just to see
15  what was being done on them.  And then we had a
16  yearly financial audit.
17    Q   So if I follow you right, the quarterly
18  audit would be a review of certain number of files?
19    A   Right.
20    Q   Just see how they were being handled?
21    A   Right.
22    Q   And then there was an annual audit on
23  financials?
24    A   Financials.
25    Q   I suppose that relates to whether there

Page 73

1  need be a true up or some reconciliation --
2     A   Correct.
3     Q   -- of what was owed; is that correct?
4     A   Yes.
5     Q   You talked about doing a due diligence and
6  getting certain documents from Palisades about your
7  servicing agreements and assignments and whatnot.
8  Could you describe for us what your due diligence
9  was?
10    A   Well basically we look at all the
11  assignment that they had.  If we knew it was with
12  Palisades, then it was less due diligence more with
13  -- but the initial contract you mean?
14    Q   Yes.
15    A   Reviewing the contract, meeting with Gary
16  and his father, and his son.  Oh, and the CFO at the
17  time.  The intern CFO, Charles, or something like
18  that.
19    Q   Was this to satisfy yourself --
20    A   Yes.
21    Q   -- that you would be proceeding with
22  soundly basis --
23    A   Yes, exactly.
24    Q   -- in collecting on judgments?
25    A   Correct.