# <u>APPENDIX F</u>

CERTIFIED COPY

```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF INDIANA
 2                    INDIANAPOLIS DIVISION
        -------------------------------------X
 3    JAMES A. CIESNIEWSKI, DARRYL NORMAN,
      on behalf of themselves and on behalf
 4    of all persons similarly situated,      CASE NO:
                                              1:16-CV-00817
 5         Plaintiffs,                        WTL-TAV

 6
        vs.
 7
      ARIES CAPITAL PARTNERS, INC,  doing
 8    business as ARIES DATA COLLECTIONS;
      ASTA FUNDING, INC, PALISADES COLLECTION,
 9    LLC, PALISADES ACQUISITION XVI, LLC;
      PARKER L. MOSS; and PARKER L. MOSS, P.C; ,
10
           Defendants.
11      --------------------------------------------X

12

13

14

15           DEPOSITION UNDER OATH of MATTHEW BLAKE

16                      May 29, 2019

17

18

19

20

21

22

23

24    MATTHEW BLAKE, Notary Public
      451687
25
```

BARKLEY
Court Reporters
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles   (415) 433-5777 San Francisco   (949) 955-0400 Irvine        (858) 455-5444 San Diego
(310) 207-8000 Century City  (408) 885-0550 San Jose         (760) 322-2240 Palm Springs  (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento    (800) 222-1231 Martinez          (702) 366-0500 Las Vegas     (800) 222-1231 Monterey
(951) 686-0606 Riverside     (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson     (516) 277-9494 Garden City
(212) 808-8500 New York City (347) 821-4611 Brooklyn          (518) 490-1910 Albany        (914) 510-9110 White Plains
(312) 379-5566 Chicago       00+1+800 222 1231 Paris          00+1+800 222 1231 Dubai      001+1+800 222 1231 Hong Kong

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF INDIANA
 2             INDIANAPOLIS DIVISION
   ------------------------------------X
 3 JAMES A. CIESNIEWSKI, DARRYL NORMAN,
   on behalf of themselves and on behalf
 4 of all persons similarly situated,    CASE NO:
                                      1:16-CV-00817
 5     Plaintiffs,                        WTL-TAV
 6
    vs.
 7
   ARIES CAPITAL PARTNERS, INC,  doing
 8 business as ARIES DATA COLLECTIONS;
   ASTA FUNDING, INC, PALISADES COLLECTION,
 9 LLC, PALISADES ACQUISITION XVI, LLC;
   PARKER L. MOSS; and PARKER L. MOSS, P.C; ,
10
     Defendants.
11
   ------------------------------------X
12                   DATE:  May 29, 2019
                     TIME:  11:15 a.m.
13
14
15        DEPOSITION UNDER OATH of MATTHEW BLAKE,
16    taken by Plaintiffs, held at the Westchester
17    Business Center, Suite 400, 75 South Broadway,
18    White Plains, New York, 10601, before a Notary
19    Public of the State of New York.
20
21
22
23
24
25
```

Page 3

```
 1 A P P E A R A N C E S
 2
 3 EDELMAN, COMBS, LATTURNER & GOODWIN, LLC.
 4      Attorneys for Plaintiffs
        20 S. Clark Street, Suite 1500
 5      Chicago, Illinois 60603
        BY:  DANIEL A. EDELMAN, ESQ.
 6      courtecl@edcombs.com
        (via teleconference)
 7
 8 CLAUSEN MILLER, P.C.
 9      Attorneys for Defendants
        ARIES CAPITAL PARTNERS, INC.
10      10 South LaSalle Street
        Chicago, Illinois 60603
11      BY:  DANIEL L. POLSBY, ESQ.
        dpolsby@clausen.com
12
13 MOSS & BARNETT, P.C.
14      Attorneys for Defendants
        ASTA FUNDING, INC.
15      PALISADES COLLECTION, LLC
        PALISADES ACQUISITION XVI, LLC
16      150 South Fifth Street, Suite 1200
        Minneapolis, Minnesota 55402
17      BY:  JOHN P. BOYLE, ESQ.
        john.boyle@lawmoss.com
18
19 KIGHTLINGER & GRAY
20      Attorneys for Defendants
        PARKER L. MOSS, P.C. and
21      PARKER L. MOSS
        211 North Pennsylvania Street
22      One Indiana Square, Suite 300
        Indianapolis, Indiana 46204
23      BY:  PETER A. VELDE, ESQ.
        pvelde@k-glaw.com
24
25
```

Page 4

```
 1   M A T T H E W   B L A K E, the witness
 2     herein, being first duly sworn by a Notary
 3     Public of the State of New York, was examined
 4     And testified as follows:
 5 BY MR. EDELMAN:
 6     Q   Could you state your name for the record,
 7 sir.
 8     A   Matthew Blake.
 9     Q   By whom are you employed?
10     A   I'm the owner of Aries Capital Partners.
11     Q   For how long have you been the owner of
12 Aries Capital Partners?
13     A   2005.
14     Q   What is your highest educational degree?
15     A   Well, a Bachelor's.  And then I did some
16 other -- so collegiate graduate.
17     Q   When did you get your Bachelor's degree?
18     A   It was 1994.
19     Q   From where?
20     A   University of Rhode Island.  I did study
21 in England as well.
22     Q   What did you do for a living between
23 graduating in 1994 and becoming the owner of Aries
24 Capital in 2005?
25     A   I did insurance, mostly life and health.
```

Page 5

```
 1     Q   I'm sorry, mostly what?
 2     A   Life insurance and health insurance.
 3 Mostly sales.  Then I moved to administrative.
 4     Q   Did you have any experience in the
 5 collection business?
 6     A   Well, yes, in that -- yes.
 7     Q   What experience did you have in
 8 collection?
 9     A   We did a little bit of skip tracing for
10 the company.
11     Q   What company are you referring to?
12     A   At that time, Northwestern Mutual Life.
13     Q   What is the business of Aries Capital?
14     A   We are a collection agency.
15     Q   Do you specialize in collection of any
16 particular types of debts?
17     A   It varies.  Any type of debt we normally
18 will take and put it through our attorney network.
19     Q   Do you special in the collection of
20 judgments?
21     A   Yes.
22     Q   Has that been the case since 2005?
23     A   Correct.
24     Q   When did you first have any connection
25 with a company called Asta Funding?
```

JAMES A. CIESNIEWSKI  v.
ARIES CAPITAL PARTNERS, INC.

MATTHEW BLAKE
May 29, 2019

Page 6

1    A   You now what, I don't really know.  It
2  started -- it's been a long relationship.
3    Q   When do you believe the relationship
4  started, at the outset of Aries Capital or
5  thereafter?
6    A   I'm sorry, can you?
7    Q   When did the relationship with Asta
8  Funding start?  Was it when you started Aries or
9  afterwards?
10    A   I believe it was originally in 2003.  And
11  then, but --
12    Q   You indicated you started Aries Capital in
13  '05?
14    A   Correct, so to answer that question,
15  that's when I became owner, yes.
16    Q   You became the owner of Aries Capital in
17  '03?
18    A   Correct.  No, '05. '05.
19    Q   When did you first become employed or
20  connected with Aries Capital?
21    A   I believe it was 1999 or 2000.  We're
22  talking 20 years ago.
23    Q   I understand.  What was your initial
24  position with Aries Capital?
25    A   Basically, operations.

Page 7

1    Q   You remained in that position until you
2  became an owner?
3    A   Correct.
4    Q   What were the circumstances of your first
5  involvement with Asta Funding?
6    A   Basically my business partner at the time
7  brought them in and I just did the administration to
8  close the paperwork.  And I believe that was around
9  2008. But I don't know.
10    Q   Who was your business partner at the time
11  to which you refer?
12    A   Harvey Lee Wind.
13    Q   Could you spell his name?
14    A   Harvey Lee Wind, my mentor.
15    Q   Harvey Lee, I'm sorry I didn't catch the
16  last name.
17    A   Wind.
18    Q   Could you spell that?
19    A   W-I-N-D, like the wind.  Blow like the
20  wind.
21    Q   He was the first person to contact Asta
22  Funding?
23    A   Correct.  Then we did it together.
24    Q   Have you ever get people from Asta
25  Funding?

Page 8

1    A   Yes.
2    Q   With whom have you dealt with at Asta
3  Funding?
4    A   Various contacts that have come and gone.
5    Q   Can you name any of them?
6    A   Well, our main contact was Lori Smith.
7  And then we -- Gary Stern is the owner.  I dealt
8  with his father and his son.  Gentleman by the way.
9  And then -- but our direct reports were various
10  employees, you know, through the course that came
11  and left.
12    Q   How many people does Aries Capital employ?
13    A   We're about 19, including subcontractors.
14  They're 1099 employees.  I call them subcontractors.
15  We're talking the same thing.
16    Q   Who is responsible for the relationship
17  with Asta Funding?
18    A   Right now it's basically me.
19    MR. EDELMAN: I'd like the court reporter
20  to show the witness what has been marked as
21  Exhibit 5.
22    (Exhibit 5 marked for identification and
23  handed to the witness.)
24    A   That's a normal pleading with James
25  Ciesniewski and Darryl Norman, who I don't know of.

Page 9

1  It names plaintiff defendants.
2    Q   I just wanted you to turn to pages PAL001
3  through 12.  It's about a quarter inch in.
4    MR. VELDE: Dan, can we identify what that
5  document is?
6    MR. EDELMAN: Exhibit 5 is Defendants'
7  Responses to Plaintiffs' First Discovery
8  Requests.
9    Q   And the first attached document is
10  entitled Attorney Network Collection Agreement.
11    MR. VELDE: Thank you, Dan.
12    A   No, I don't have that.  I'm looking at 11
13  to 12. Hold on.  My answer is no, this isn't the
14  document.
15    MR. BOYLE: At the end of the answers.
16    MR. POLSBY: It's attachments to
17  Exhibit 5.
18    MR. BOYLE: So it should be coming up
19  right after the signatures.
20    A   Okay.  What are your questions on that?
21    Q   Do you recognize the Attorney Network
22  Collection Agreement?
23    MR. POLSBY: We're not in the right place.
24  He's talking abut the Attorney Network
25  Collection Agreement, PAL001.

JAMES A. CIESNIEWSKI v.
ARIES CAPITAL PARTNERS, INC.

MATTHEW BLAKE
May 29, 2019

Page 10

1    A   Is that the Parker Moss?
2    Q   No this is --
3    A   Palisades, right.
4    Q   -- Attorney Network Collection Agreement
5    between Palisades Collection and Aries Capital
6    Partners.
7    A   What pages, sir?
8    Q   PAL0001, and it says Exhibit page 99 in
9    the left-hand corner.
10   A   Okay.
11   Q   Do you have it in front of you, the
12   Attorney Network Collection Agreement?
13   A   Correct.
14   Q   Did you sign that on page PAL000012?
15   A   Yes, that's my signature.
16   Q   You signed as vice president?
17   A   Correct.
18   Q   Who was president at the time?
19   A   His name is Lee Wind.
20   Q   Do you recognize the person that signed
21   for Palisades Collection?
22   A   Yeah.
23   Q   Cameron Williams.
24   A   Gary.  That's Gary.  It says Gary on
25   there.  He's no longer with the company.  He was the

Page 11

1    intern CFO, another gentleman.
2    Q   Is the date on the first page PAL000001
3    January 15, 2009?
4    A   I'm sorry, the first page?  I don't want
5    -- I don't have readers.
6    Q   Yes, of the Attorney Network Collection
7    Agreement?
8        MR. BOYLE: It's at the top.
9    A   I don't know what that says.  Oh, yes,
10   it's 2009.  January something of 2008.  Is that
11   eight or nine?
12   Q   Was there a prior --
13       (Cross-talk.)
14       MR. BOYLE: For the record, this is John
15   Boyle, the witness apparently forgot his
16       reading glasses so he's having difficulty
17       reading.
18   A   But I can't see it, even if I had my
19   readers I couldn't see that.  It's 2009 or 2008.
20   It's January definitely.
21   Q   Was this the only attorney network
22   collection agreement that Aries had with Palisades
23   Collection?
24   A   This is our main one, yes.
25   Q   Was there a prior version or agreement?

Page 12

1    A   No, nope.  In 2003 we just got a
2    placement.  There was no agreement.  It was a basic,
3    who knows.  I mean that's past the statute anyway.
4    Q   Was there some occasion or event that
5    caused the execution of this attorney network
6    collection agreement?
7    A   Yeah, placements of judgment.
8    Q   Was there an increase in the volume of
9    judgments that you were obtaining from Asta Funding
10   in early 2009?
11   A   It was pretty consistent, sure.
12   Q   What do you mean by "pretty consistent?"
13   After 2009 or before?
14   A   Well they -- no after, after.
15   Q   For how long did Palisades Collection
16   continue to place judgments with Aries Capital for
17   collection?
18   A   I mean I can't give you specifics but we
19   have a long standing relationship, sure.
20   Q   Until now or until very recently?
21   A   Relatively recently, yes.  The last
22   placement I wouldn't know.
23   Q   Did you have a discussion with somebody at
24   Asta Funding or Palisades Collection as to the
25   source of the judgments that you got after 2009?

Page 13

1    A   Of course.  We have the original attorney
2    name, okay.  And if it was substituted in, sure.
3    And then we took that and that judgment and placed
4    it with various attorneys.
5    Q   Did you have a network of attorneys prior
6    to January of 2009?
7    A   Mostly in New York.
8    Q   Prior to early 2009 had you done any work
9    collecting judgments in Indiana?
10   A   I don't know.  I really don't know.
11   Q   Does the name Wolpoff & Abramson mean
12   anything to you?
13   A   Yeah, yeah.
14   Q   What does it mean to you?
15   A   They were a law firm.  They're in
16   Maryland.  Stuart Wolpoff, he was a buyer.  And then
17   they -- I think they sold out from what I
18   understand.  So they were the buyer.
19   Q   When you say that Stuart was "a buyer,"
20   was he buyer of debts?
21   A   Correct.
22   Q   Did Stuart Wolpoff have anything to do
23   with the judgments that you began collecting from
24   Palisades Collection in early 2009?
25       MR. POLSBY: I'm going to object to

Page 14

1    foundation on that.  Answer the question if you
2    can.
3        A   I know that it's no longer in business.
4    That's all I can tell you.  I know he went into the
5    banking industry.  He wasn't an attorney.  His
6    father was.
7        Q   Does the name Palisades Acquisition mean
8    anything to you?
9        A   Yeah, they're the buying entity.  Just
10   like any bank --
11           (Cross-talk.)
12       A   Just like any bank would buy out another
13   bank.
14       Q   I'm sorry, who bought out who?
15       A   Don't know.
16       Q   But you're familiar with a buying entity
17   called Palisades Acquisition, usually with a number
18   after it?
19       A   Correct.
20       Q   Do you know what the connection is between
21   Palisades Collection and the Palisades Acquisition
22   entity?
23           MR. POLSBY: I'm going to object to
24   foundation.  Answer that if you can, please.
25       A   Rephrase the question, please.

Page 15

1        Q   Do you know if there is a connection
2    between Palisades Collection and any of the
3    Palisades Acquisitions entities?
4            MR. POLSBY: Same objection.
5        A   Yeah, I would have to go with counsel on
6    that one.  I don't know.  I really don't.
7        Q   You don't know is a perfectly acceptable
8    answer if that's correct.
9            Do you know if there's any connection
10   between Palisades Collection and Asta Funding?
11           MR. POLSBY: Same objection.  Foundation.
12   Answer that if you can.
13       A   I know that Asta is a public company and
14   used to raise financing.
15       Q   Do you know what Palisades Collection has
16   to do with it, if anything?
17       A   Buying entity.
18       Q   Is there also a connection between
19   Palisades Acquisition and Asta Funding?
20           MR. POLSBY: Objection to foundation.
21   Answer if you can.
22       A   I'm sorry, say that again.
23       Q   Do you know if there is any connection
24   between Palisades Acquisition and Asta Funding?
25           MR. POLSBY: Same objection.

Page 16

1        A   Different companies.
2            (Cross-talk.)
3        A   Different corporate companies.
4        Q   I'm sorry, you broke up.
5        A   They're different corporations.
6        Q   Is there somebody that you deal with at
7    the Palisades Acquisition entities?
8        A   No.
9        Q   If you're collecting a debt for one of the
10   Palisades Acquisition entities who would you deal
11   with?
12       A   Right now?  Well, it changed.
13       Q   Or in the past.
14       A   In the past there were various.  But right
15   now we're dealing with a main contact there.
16       Q   Do you know the name of the main contact?
17       A   Yea, you're deposing her.  Her name is
18   Lori Smith.
19       Q   Did you deal with Lorry Smith for
20   Palisades Collection or Palisades Acquisitions, or
21   both?
22       A   Various, various portfolio.  But never
23   Asta Funding I believe. I don't know.  Might have
24   been one or two in there.
25       Q   Do you know who Lorry Smith works for?

Page 17

1        A   No.  Either Asta Funding or Palisades.
2    I'm not sure.  I don't know how she's paid.
3        Q   After you started getting judgments from
4    Palisades Collection to collect how is information
5    furnished to Aries Capital?
6        A   Through various spreadsheets and usually
7    through a link that was secured.
8        Q   Was there some software that was
9    associated with the link?
10       A   I believe we tie into their system with
11   various passwords that changed due to security.  And
12   then we download it in our system.  And we have
13   security procedures in place.
14       Q   What kind of software does Aries Capital
15   use?
16       A   It's called C-Pro.
17       Q   Could you spell that?
18       A   C-P-R-O.
19       Q   Does it stand for something?
20       A   Collector Pro.
21       Q   When you got spreadsheets of judgments
22   from Palisades Collection what did you do with them?
23       A   They were more TXT files.  They weren't
24   spreadsheets.  I retract that one.  They were TXT
25   files, which we had to cull into data and put it

JAMES A. CIESNIEWSKI v.
ARIES CAPITAL PARTNERS, INC.

MATTHEW BLAKE
May 29, 2019

Page 18

1   into our system.  It was very secure though, I will
2   have to say that.  We were very concerned about
3   people's data.
4       Q   Once you loaded the information into your
5   system what happened to it?
6       A   We took it and placed it based on the
7   State.
8       Q   Were there specific State that Aries
9   Capital handled for Palisades Collection?
10      A   Yes, various.
11      Q   Which States?
12      A   The main was New York.
13      Q   Did you also handle in Indiana?
14      A   Yes, but small.  I mean onsies, twosies.
15  I don't know the total amount, but it's very small.
16      Q   Did Aries Capital have exclusive
17  territories or do you know if Palisades also used
18  other people to collect in Indiana?
19          MR. POLSBY: I'm going to object to that,
20      Dan, based on the timeframe.  You're talking
21      about a 16-year period.  Can we narrow that
22      down a little bit because that may have changed
23      over time.
24          THE WITNESS: Yeah.
25      Q   Let's concentrate on the period from the

Page 19

1   end of 2013 to now.  Did you have exclusive areas
2   that you handled for Palisades?
3       A   No.
4       Q   Do you know if Palisades used other
5   collection agencies to collect from Indiana
6   residents?
7           MR. POLSBY: Object to foundation, but
8       answer that if you know.
9       A   They must, but I don't know.  I don't know
10  their inner workings.  They're not my company.
11      Q   Understood.  Does the name Parker Moss
12  have any meaning to you?
13      A   Yeah, I don't like him.  I'm kidding.
14  That was a joke.
15      Q   Is he an attorney in Indiana?
16      A   Yes.
17      Q   When did you first meet or have any
18  contact with Parker Moss?
19      A   Geez, I don't know when -- I really don't
20  know.
21      Q   Do you know if it was before or after the
22  Attorney Network Collection Agreement was put in
23  place?
24      A   Pardon?
25      Q   Do you know if you first contacted Parker

Page 20

1   Moss before or after the Attorney Network Collection
2   Agreement was in place?
3       A   Yeah, I mean there was probably an
4   introduction there, sure.
5           (Cross-talk.)
6       A   But, just calling them as an outsource
7   attorney.
8       Q   Do you know where you got the name Parker
9   Moss from?
10      A   Yes.  We only used people that --
11  attorneys that were with -- NARCA affiliated, which
12  is basically a national association of retail
13  collection attorneys.
14      Q   Did you contact Parker Moss because
15  Palisades Collection was sending you judgments from
16  Indiana?
17      A   That, or maybe another portion of what I,
18  you know, if I bought in Indiana, maybe.  I don't
19  know.
20      Q   How did you transmit information to
21  attorneys in the network?
22      A   Through data.
23      Q   Was the data taken directly from the C-Pro
24  system and sent to the attorneys?
25      A   From time to time, yes, depending on our

Page 21

1   workflow.
2       Q   Did Aries Capital do anything with the
3   data before sending it to the attorneys in the
4   network?
5           MR. POLSBY: I'm going to object to vague,
6       but you can answer that if you can.
7       A   Pardon, say that again.
8       Q   Did Aries Capital do anything with the
9   data after putting it into the system and before
10  sending it to the attorneys in the network?
11          MR. POLSBY: Same objection.  Answer it if
12      you can.
13      A   Yeah.  I mean we have to make sure the
14  data is correct.  But at best we can't assist the
15  attorney to do his own work in that state.
16      Q   What did Aries Capital do to make sure
17  that the data was correct?
18      A   Just make sure it was in the right
19  columns.
20      Q   So you reviewed the data to make sure that
21  it was internally consistent and made sense?
22      A   Right, based on what could go out to the
23  attorney to kind of make it easier for that attorney
24  do his or her internal work.
25      Q   Were the debts you were handling for

JAMES A. CIESNIEWSKI v.
ARIES CAPITAL PARTNERS, INC.

MATTHEW BLAKE
May 29, 2019

Page 22

1 Palisades Collection all debts that had been reduced
2 to judgments already?
3      **MR. POLSBY:** I'm going to object to
4  foundation, but answer that if you can.
5   **A** If you don't mind can you rephrase that, I
6 mean say that again?
7     (Cross-talk.)
8   **Q** You were getting debts from Palisades
9 Collection. Had they been turned into judgments
10 already or was it necessary to start from the
11 beginning?
12      **MR. POLSBY:** Same objection. Answer that,
13  please.
14   **A** No, they're all judgments. Courts ordered
15 judgments signed by a judge, or a clerk.
16   **Q** Did Aries Capital do anything such as skip
17 trace to obtain current addresses for the judgment
18 debtors?
19   **A** Yeah, from time to time, sure.
20   **Q** Was that done internally at Aries Capital?
21   **A** It's through a system called Accurint,
22 which is now owned by Experian. And that's just
23 addresses. We try to get the most recent address.
24   **Q** Would that be done with all judgment
25 debtors that Aries Capital was handling?

Page 23

1   **A** No, not everyone, no. We outsource it.
2   **Q** Was there some criteria that you used for
3 determining when you would attempt to update
4 addresses?
5   **A** No, we put that on the outsource
6 attorneys.
7   **Q** But you did some of the skip tracing
8 yourself?
9   **A** Yes, yeah. Skip tracing based on the
10 address you mean?
11   **Q** Yes.
12   **A** Yes. But, you know what, depending on the
13 client's criterion. And then we'd also get updated
14 addresses that we'd put in our system.
15   **Q** When you were dealing with Palisades
16 Collection judgment did you do skip tracing in all
17 of those or some of those or none of them?
18      **MR. POLSBY:** I'm going to object. That's
19  been asked and answered, but you can answer
20  that again.
21   **A** Again, I don't recall. I can't give
22 statistics of what was done. I have outsources.
23   **Q** Did Aries Capital do anything besides skip
24 tracing with respect to the data between the time it
25 was put in Aries' computer system and the time data

Page 24

1 was sent to network attorneys?
2   **A** Sometimes we did. But mostly on stuff
3 that we owned.
4   **Q** What other type of things would be done
5 with the data?
6      **MR. POLSBY:** Objection to vague. Answer
7  that if you can.
8   **A** You know what, we would correct the --
9 make sure the name was correct. But then you have
10 the caption. Here's an example. You got
11 Ciesniewski here, but let's say the E was before the
12 I. We'd -- basically data.
13   **Q** You would make sure that the spelling was
14 consist throughout?
15   **A** Yeah, we try our best.
16      **MR. EDELMAN:** I'd like the court reporter
17  to show the witness what has been marked as
18  Exhibit 13.
19     (Exhibit 13 marked for identification and
20  handed to the witness.)
21   **Q** It consists of pages which have Bates
22 numbers 00033 through 41.
23   **A** Right, gotcha.
24   **Q** Could you tell me if you recognize this
25 form of document.

Page 25

1   **A** Yeah, it was a TXT file that would come
2 through.
3   **Q** Is this the file you would have gotten
4 from Palisades Collection?
5   **A** Very similar.
6   **Q** Do you know if this spreadsheet or this
7 file was generated before or after --
8      **MR. BOYLE:** Can we pause for a second so
9  we can see what this is.
10      **MR. EDELMAN:** Okay.
11      **MR. BOYLE:** Thanks.
12   **Q** Is this a file or part of a file that
13 Palisades Collection sent to Aries Capital?
14   **A** Yeah.
15   **Q** Do you know if any changes appear to have
16 been made between the time Aries Capital received it
17 and it was sent to a network attorney?
18   **A** Just verifying the address maybe. Maybe.
19   **Q** When you got judgments from Palisades
20 Collection did you receive any documentation in
21 addition to the spreadsheet, for example, court
22 papers?
23   **A** Only upon request. I think. Yeah, I mean
24 -- or we had the attorney request it. We would just
25 have the attorney request it usually.

Page 26

1 Q When you're collecting your judgment would
2 you receive for each judgment an actual image or
3 copy of the judgment?
4 A No, it's usually in data form and then we
5 would request it if they had it.
6 Q Looking at page 00033 where did the name
7 Centurion Capital Corp. come from?
8 A They were part of Wolpoff and Abramson
9 buying entity. They had some buying entities and
10 Centurion was one of them and Seneca was one of
11 them. Just various -- all fell under sold as Great
12 Seneca.
13 Q As long as we're on that, does the name
14 Monarch Capital mean anything to you?
15 A No, not to me. It's a judgment,
16 plaintiff.
17 Q Do you know of any other Wolpoff &
18 Abramson buying entities?
19 A Me. I used to buy from them.
20 Q Does the name Platinum Financial Services
21 mean anything to you?
22 A They were something I believe that was
23 bought by Great Seneca.
24 Q What about Colonial Credit Corporation?
25 A Not sure.

Page 27

1 Q Sage Financial?
2 A Not sure. I can't really give an answer
3 on that one. All under Great Seneca though, I'm
4 pretty sure of that.
5 Q Going back to page 00033, was the name of
6 the plaintiff something that was supplied by
7 Palisades Collection?
8 A Yeah. And the court name and the court --
9 (Cross-talk.)
10 A This is just judgment data right here.
11 MR. POLSBY: Hold on. Let him ask a
12 question.
13 A Okay, I'm sorry, sir.
14 Q Did Aries Capital do anything to determine
15 whether Centurion Capital Corp. was still in
16 existence?
17 A No. We did -- basically we got the
18 assignments and the Bill of sales from Palisades.
19 And we have a chain of title that we felt we could
20 move upon, sure. We did our due diligence on that.
21 Q From whom to whom were the assignments?
22 A Palisades to their other buying entity.
23 They bought it through one entity and they went to
24 put it into a separate corporation I believe. And
25 then that's why you see a little scattered chain of

Page 28

1 assignment. But you have -- yeah, that's my answer.
2 Q There is information about a docket number
3 and a court page 00033. Did Aries do anything to
4 access the court files?
5 A Pardon.
6 Q Did Aries do anything to access the court
7 file in Marion County Superior Court --
8 A Possibly. Maybe. I don't know. I don't
9 know.
10 MR. POLSBY: Hold on one second. Just
11 make sure you let him finish asking the
12 question --
13 A Oh, I'm sorry, sorry sir.
14 MR. POLSBY: You have to let him finish
15 asking the question so we can have a clear
16 record.
17 THE WITNESS: Okay.
18 MR. POLSBY: Sorry, Dan, go ahead.
19 Q Did Aries Capital do anything to access
20 court files for the cases in which judgments had
21 been entered that you were collecting?
22 A Yes, but we mostly asked our attorneys to
23 do that.
24 Q Did Aries Capital do any of it itself?
25 A Yes, for mostly the stuff that we owned.

Page 29

1 Q Were there any instructions that were
2 furnished to network attorneys such as Parker Moss?
3 A Yes.
4 Q In what form were the instructions? Were
5 they oral, written or something else?
6 A They were oral and written on the
7 placement saying you put the current creditor on
8 that and the current assignee. I'm using the term
9 assignee meaning who owns the debt.
10 Q With respect with a particular debt that
11 starts on page 00033, who was supposed to have been
12 the current creditor or assignee?
13 MR. POLSBY: Object to foundation. Answer
14 the question if you can.
15 A It should be Palisades, whatever.
16 Whatever the entity assigned to. That's Centurion
17 Capital. The Plaintiff is Centurion Capital. You
18 got the judgment amount. You have all of this
19 information. It's enough for me to go by and send
20 to the attorney for -- yup.
21 Q Do you recall telling Parker Moss or
22 somebody in his office to update the assignee?
23 A Yes. That's pro forma, yup.
24 Q Do you actually recall a communication to
25 that effect?

JAMES A. CIESNIEWSKI v.
ARIES CAPITAL PARTNERS, INC.

MATTHEW BLAKE
May 29, 2019

---

Page 30

1     A  No, no.  Not on this specific case, no.
2     Q  Do you recall communications with Parker
3 Moss or anybody in his office generally as to
4 identification of assignees?
5     A  No.
6     Q  Were there any written instructions that
7 were furnished to the attorneys in the attorney
8 network?
9     A  I'm sorry, say that again.
10     Q  Were any written instructions furnished by
11 Aries Capital to attorneys in its attorney network?
12     MR. POLSBY: Objection.  I think it's been
13   asked and answered.  You can answer that again.
14     A  Yeah, no, I'm good.
15     Q  Either I didn't hear or?
16     A  I'm just going to say no, I think that's
17 been answered already with all due respect.
18     Q  You did not leave any written
19 instructions?
20     A  Pardon?
21     Q  You don't believe there were any written
22 instructions?
23     A  Yeah, in e-mail format usually.
24     Q  Did you retain e-mails that were sent to
25 network attorneys?

Page 31

1     A  You know, we're talking years ago.  On
2 this particular case we're going three years.
3     Q  Do you know if the e-mails were retained?
4     A  They're probably on our server, maybe.
5 Maybe.
6     Q  Did you send e-mails to all attorneys in
7 the network simultaneously?
8     A  Simultaneously, no.
9     Q  Was there a standard e-mail of
10 instructions --
11     A  Correct.
12     Q  -- that were furnished to network
13 attorneys?
14     A  Yes.  Can we pause for a moment?  If you
15 don't mind, may I use the restroom, please?
16     MR. EDELMAN: Let's take a five minute
17   break.  I'll leave the link on since I don't
18   want to disconnect.
19     (Short recess.)
20     Q  Did Aries have any requirement with
21 respect to data links with the attorneys in the
22 network?
23     A  Possibly.
24     Q  You don't remember?
25     A  No.

Page 32

1     Q  Did you have access to the computer
2 systems of the attorneys in the network?
3     A  Upon request, yes.
4     Q  Do you know if you had access to the
5 computer system of Parker Moss?
6     A  No, no, we did not.  They're a smaller
7 firm.
8     Q  Was Parker Moss the only firm you used in
9 Indiana?
10     A  I believe so.
11     Q  Did you do anything to audit or inspect
12 the files of attorneys in the network?
13     A  I don't recall.
14     Q  Do you know or recall if Asta or Palisades
15 Collection, or any of the Palisades Acquisitions
16 entities had access to Aries files in computer
17 system?
18     A  No, no we don't allow that at all.
19     Q  Did they ever come and audit or inspect
20 what Aries was doing with their files?
21     A  No.  We outsourced it.
22     Q  Did anyone from Asta Funding or Palisades
23 Collection or the Palisades Acquisition entities
24 ever visit Aries Capital's offices?
25     A  Yes.

Page 33

1     Q  Do you recall who visited?
2     A  Whoever, the accounting.  And then we had
3 regular scheduled audits.
4     Q  You had regularly scheduled audits?
5     A  Correct.
6     Q  How often or how frequently would you
7 audit?
8     A  Usually quarterly.  And then any type of
9 -- yeah, quarterly.
10     Q  The persons conducting the audit, do you
11 recall who they were?
12     A  His name was Steve Barry, B-A-R-R-Y.
13     Q  He did all the audits or were there other
14 people as well?
15     A  Lori Smith is the most recent.
16     Q  Do you know who Mr. Barry works for?
17     A  I believe now he is I think -- I'm not
18 sure.
19     Q  At the time he visited your offices do you
20 know which entity he worked for?
21     A  No.
22     Q  When Barry or Lorry Smith or others came
23 to your offices did they actually look at the
24 information in your computer system?
25     A  Yes.

---

JAMES A. CIESNIEWSKI v.
ARIES CAPITAL PARTNERS, INC.

MATTHEW BLAKE
May 29, 2019

Page 34

1    Q    Would they have seen the spreadsheets that
2  you received from Palisades Collection and the
3  information that you furnished the network
4  attorneys?
5    A    Yes.
6    Q    Did anybody from Palisades Collection ever
7  tell you to correct anything with respect to what
8  you were doing on their accounts?
9    A    Yeah, we always had procedure.  Sure.  But
10  mostly we directed that procedure to our attorney
11  network.
12    Q    Did anybody from Palisades Collection or
13  Asta Funding or Palisades Acquisitions ever tell you
14  that use different names with respect to the people
15  being named --
16    A    No.
17    Q    -- in collection cases?
18    A    No, sir.
19    Q    Prior to entering into the Attorney
20  Network Collection Agreement had you ever done any
21  work for these Wolpoff debt buying entities?
22    A    No.
23    MR. EDELMAN: I'd like the witness to look
24  at Exhibit 5 and the attached documents
25  starting at PAL000016 entitled Purchase of

Page 35

1    Sale.
2    (Exhibit 5 in front of witness.)
3    Q    Have you ever seen this document before?
4    A    Yeah.
5    Q    When did you first see it?
6    A    I would say whatever date -- I guess 2008.
7    Q    Did you see it when you first started
8  getting judgments to collect from the Palisades
9  entities?
10    A    Yeah, we did thorough due diligence on
11  these on the contract.  It's called on-boarding
12  meaning are we going to do business together.
13    Q    Does Aries have a due diligence file
14  pertaining to the Palisades and Asta organization?
15    A    No.
16    Q    What did your on-boarding procedure
17  consist of?
18    A    Paperwork and meetings.
19    Q    What kind of paperwork was involved?
20    A    Our contract with them.
21    Q    As part of the due diligence procedure did
22  you obtain the purchase of sale agreement for the
23  judgments you were collecting?
24    A    Yeah, bill of sale.  It's in your
25  exhibits.

Page 36

1    Q    Do you know if Palisades Acquisition or
2  Asta Funding got all of the judgments that the
3  Wolpoff entities had or less than all of them?
4    MR. POLSBY: Objection to foundation on
5    that one.  Answer if you can.
6    A    I object.
7    THE WITNESS: What do I have to do?
8    MR. POLSBY: Answer the question.  I do
9    the objections.
10    A    He's in my ear so, sorry.  Ask that
11  question again, please.
12    Q    Do you know if Palisades Acquisition
13  acquired all of the debts that the Wolpoff entities
14  had or less than all of them?
15    MR. POLSBY: Same objection.  You can
16    answer.
17    A    That, I don't know.  I can't answer that
18  one.
19    Q    Do you know if the judgment debtors were
20  notified in any manner that the debts had been
21  purchased by Palisades Acquisition?
22    A    They're required to, sure.
23    Q    Who gave that notice?
24    A    I think it was verbal to the attorneys.
25    Q    Was that a verbal instruction that Aries

Page 37

1  Capital gave to the attorneys in the network?
2    A    Correct.
3    Q    Did you request copies of form letters or
4  other documents that were used to give notice to the
5  judgment debtors of who owned the debts?
6    A    Can you repeat that, sir.
7    Q    Did you obtain copies of letters or
8  notices that were sent by the network attorneys to
9  inform the judgment debtors --
10    A    No.
11    Q    -- who now owned the debt?
12    A    No, we didn't.  It's basically a dunning
13  letter, as it's called.
14    Q    Did you routinely obtain either all
15  letters are forms of letters that the attorneys in
16  the network sent to debtors?
17    A    No.
18    Q    Could you please turn to page PAL00028
19  still in the Purchase and Sale Agreement.
20    A    Okay.
21    Q    In 7.1 with Use of Name, do you see that?
22    A    Uh-huh.
23    Q    Did you furnish this paragraph to the
24  attorneys in the network?
25    A    Yes.

JAMES A. CIESNIEWSKI v.
ARIES CAPITAL PARTNERS, INC.

MATTHEW BLAKE
May 29, 2019

Page 38

1    Q   In what manner did you furnish it?
2    A   Just bear with me.  Okay.  We would put it
3  in the data form that we sent it to them.  The
4  current owner.
5    Q   Did you furnish the entire Purchase and
6  Sale Agreement to the attorneys in the network?
7    A   Only if they requested it.
8    Q   Do you know if Parker Moss or anybody else
9  in Indiana made such a request?
10    A   I am not sure.
11    Q   Does Aries have a correspondence file for
12  each attorney in the network?
13    A   Can you define "correspondence."
14    Q   Do you collect in a single place either
15  paper or electronic in form all letters, e-mails,
16  other communications with an attorney in the
17  network?
18    A   No.
19    Q   Do you have the ability in your computer
20  system to retrieve all e-mails or communications
21  with a specific attorney in the network?
22    A   No.
23    Q   In the course of placing judgments for
24  collection on behalf of Palisades Collection did any
25  issues arise as to proper chain of assignments?

Page 39

1    A   It was provided as needed.
2    Q   Did any judgment debtor question whether
3  whoever was attempting to collect from them had the
4  right to do so?
5      MR. POLSBY: Objection to foundation on
6    that.  Answer if you can.
7    A   No.
8    Q   You're not aware of that at all?
9    A   Not to my knowledge.
10    Q   Do you know if any court raised the
11  question as to who had the right to collect the
12  Wolpoff entity debts that Palisades Collection has
13  placed?
14      MR. POLSBY: Objection to the foundation
15    on that.  Answer if you can.
16    A   I'm not aware.
17    Q   Did any of the network attorneys request
18  copies of assignments for use and collection?
19    A   Not aware.
20    Q   Do you recall furnishing copies of
21  assignments to attorneys in the network?
22    A   I may have.  I'm not sure.
23    Q   If you did furnish a copy of an
24  assignment, would the assignment have referenced the
25  specific debt, and if so, how?

Page 40

1    A   Not sure.
2    Q   During the years 2013 to present what
3  portion of Aries' business was being obtained from
4  Palisades Collection?
5    A   I'd have to say 45 percent.
6    Q   Going back to Exhibit 5, could you please
7  turn to the page that's marked PAL000046?
8      MR. POLSBY: This is a document identified
9    as bill of sale, right.
10      MR. EDELMAN: Yes.
11    Q   This was one of the documents that was
12  attached to the Purchase and Sale Agreement when
13  Aries got it, right?
14    A   Yeah, both three of the -- yes.
15    Q   It refers to something attached to
16  schedule one?
17    A   Pardon?
18    Q   It refers to something attached to
19  schedule one.  Schedule one, do you see that?
20    A   Yeah, okay.  The next page, that bill of
21  sale.  Palisades Acquisition, okay.
22    Q   That's the schedule one.  It refers to a
23  CD attached to Tab 15, do you see that?
24    A   Yes.
25    Q   Have you ever seen the CD attached to Tab

Page 41

1  15.
2    A   Yes.
3    Q   Do you have a copy?
4    A   Yes.
5    Q   It's presently in possession of Aries
6  Capital?
7    A   I have what you have here, yes.
8      MR. POLSBY: No, he's asking if you have
9    the CD.
10      THE WITNESS: Oh, the CD.
11      MR. POLSBY: Take a look at number 0050,
12    and what counsel is asking you, do you see what
13    refers to as CD?
14      THE WITNESS: Yes.
15    A   No, I do not have that.
16      MR. POLSBY: That's what counsel was
17    asking, if you had the CD.
18      THE WITNESS: Okay.  Sorry.
19    Q   Have you ever seen the CD?
20    A   No.
21    Q   Have you ever seen anything that purports
22  to be a printout of all or part of what is in the
23  CD?
24    A   No.
25    Q   How would you determine whether a debt was

**Page 42**

1  one of those that was transferred pursuant to the
2  Bill of Sale?
3      MR. POLSBY: I object to that as vague.
4  You can answer that question.
5      A  Yeah, I don't know.  Go by the caption.
6      Q  "By the caption" on the information that
7  was sent to Aries by Palisades Collection?
8      A  Well, we outsource it and we ask that the
9  attorney, you know, handle it.
10     Q  I'm sorry, how would the network attorney
11 determine whether, in this case Great Seneca
12 Financial Corporation, had transferred a debt to
13 Palisades Acquisition's attorney?
14     MR. POLSBY: I object to that question on
15  foundation.  Answer that if you can.
16     A  Basically the Court has a caption.  Then
17 the current assignee is the current owner.
18     Q  And the current assignee would be
19 Palisades Acquisition XV?
20     A  I believe so.  Actually -- I'm not certain
21 of that actually.
22     Q  Whoever the current owner is, how would
23 you or Aries Capital know that a specific debt has
24 been transferred from Great Seneca or one of the
25 other Wolpoff entities to Palisades Acquisition or

**Page 43**

1  whoever the current owner is?
2      A  I would be told by my client.
3      Q  And your client would be Palisades
4  Collection?
5      A  On this case, yes.
6      Q  Would you be told in the form of the data
7  transmission that you described previously?
8      A  Correct.
9      Q  What is Houselanger & Associates?
10     A  He's one of my attorneys.
11     Q  He's an attorney for Aries Capital?
12     A  Yup.  Yes.
13     Q  At some point did your relationship with
14 Parker Moss cease?
15     A  Yeah, based on this recent lawsuit, yes.
16     Q  Could you describe what happened between
17 you and Parker Moss?
18     A  It's request in mutual indemnification,
19 that's all.
20     Q  Was there a meeting or a phone
21 conversation between you and somebody at Parker
22 Moss?
23     A  It could have been a phone conversation.
24     Q  Do you recall what you said to one
25 another?

**Page 44**

1      A  Not then.  I mean we're talking a while
2  ago, sir.
3      Q  But the termination of the relationship
4  had to do with the Ciesniewski lawsuit?
5      A  I believe so, yes.
6      Q  Who initiated the termination?
7      A  We just stopped placing.
8      Q  After you stopped placing debts with
9  Parker Moss, did Parker Moss continue to handle any
10 debts which had been previously placed with them by
11 Aries Capital?
12     A  No, no, not to my recollection.
13     Q  How did Parker Moss handle the transfer of
14 funds on the judgments he had for collection to
15 Aries Capital?
16     MR. POLSBY: I'm going to object to the
17  foundation on that.  Answer that if you know
18  the answer.
19     A  I don't know.
20     Q  Did you know if Parker Moss did in fact
21 collect money on the judgments that Aries Capital
22 sent to them?
23     MR. POLSBY: Same objection.  You can
24  answer.
25     A  Yeah.  I mean up to the termination of the

**Page 45**

1  relationship, sure.
2      Q  If a debtor made a payment who could he
3  make the payment to?
4      A  The Parker Moss firm.  Are you're talking
5  about Parker Moss, sir?
6      Q  Yes.
7      A  It would go to Parker Moss.
8      Q  If Parker Moss limits funds to Aries
9  Capital from time to time?
10     A  Yes.
11     Q  Did a debtor ever send funds directly to
12 Aries Capital?
13     A  No, it would have been referred -- if we
14 got a phonecall, it would have been referred back to
15 Parker Moss.
16     Q  Did Aries Capital ever receive
17 communications from debtors that the network
18 attorneys were trying to collect from?
19     A  Yes.  And we would then place it back with
20 -- refer them to the network attorney.
21     Q  Did Aries Capital send any communications
22 to debtors who debts were being handled by the
23 attorney network?
24     A  No, that was absolutely outsourced.
25 Unless it was New York.

Page 46

1    Q   Did you have any idea why a debtor would
2  ever call Aries Capital?
3    **A   They would call just because it was maybe**
4  **on their -- it was public record and Palisades would**
5  **refer it to us and we would put it through the**
6  **network.**
7    Q   What kind of a public record would exist
8  showing that Aries Capital was involved with a debt?
9    **A   None.**
10   Q   Other than Indiana and New York do you
11 recall what other states you have collected
12 Palisades Collection debts in?
13   **A   Mainly New York.**
14   Q   Any other states?
15   **A   Maryland, New Jersey.**
16   Q   Maryland and what was the other one, New
17 Jersey?
18   **A   Correct.**
19   Q   What attorneys did you use in New York?
20   **A   Houselanger & Associates.  You had**
21 **mentioned his name earlier.**
22   Q   What attorneys did you use to collect
23 Palisades Collection debts in New Jersey?
24     **MR. POLSBY:** I'm going to have to object
25   to that one regarding New Jersey.  I believe

Page 47

1    the attorney network is the subject of the
2    motion to compel file, and the Court hasn't
3    ruled on that yet.
4      **MR. EDELMAN:** Are you instructing the
5    witness not to answer with respect to States
6    other than Indiana and New York?
7      **MR. POLSBY:** Yes, that's a fair statement.
8    Q   After the termination of the relationship
9  in Indiana with Parker Moss did some other attorneys
10 handle Indiana business for you?
11   **A   No.**
12   Q   Did Parker Moss report to Aries Capital
13 from time to time as to what it was doing?
14   **A   No.**
15   Q   If a judgment debtor filed bankruptcy
16 while the debt was being handled by Parker Moss,
17 would Parker Moss inform Aries Capital in some
18 manner?
19   **A   No.**
20   Q   Did Parker Moss return any files --
21     (Inaudible.)
22     **MR. VELDE:** You broke up, Dan.
23     **MR. POLSBY:** Your entire question was
24   garbled.  Could you repeat?
25     **MR. EDELMAN:** Yes.

Page 48

1    Q   Prior to the termination of the
2  relationship with Parker Moss did Aries Capital get
3  specific files back from Parker Moss?
4    **A   Only closed files.**
5    Q   Were there any reasons why Parker Moss
6  would close a file other than payment in full?
7    **A   I'm not familiar.**
8    Q   If the file was closed and returned what
9  would Aries Capital do with respect to its records?
10   **A   We'd possibly -- more than likely we'd**
11 **keep it or return it to Palisades.**
12   Q   Would the open -- records the reason why
13 the file has been closed or the debt had been
14 returned?
15   **A   We'd just see if maybe we would place it**
16 **for a call center if it was in statute.  If not, we**
17 **would return it or close it out in our system.**
18   Q   Return it to Palisades Collection?
19   **A   Correct.**
20   Q   After the relationship with Parker Moss
21 was terminated what happened to the files that
22 Parker Moss was then handling for Aries Capital?
23   **A   I don't know.**
24   Q   Going to back to Exhibit 5, could you look
25 at page PAL000103?

Page 49

1      **MR. POLSBY:** Dan, I just want to clarify,
2    what you're talking about at PAL103 is
3    something identified as a link report; is that
4    right.
5      **MR. EDELMAN:** Yes.
6      **MR. POLSBY:** Okay.  It's right in front of
7    him.
8    Q   My first question is do you recognize the
9  document that begins at page PAL103?
10   **A   It appears to be a credit report.**
11   Q   Is it a credit report that Aries Capital
12 obtained?
13   **A   No.**
14   Q   Did Aries Capital obtain credit reports on
15 judgment debtors that were forwarded?
16   **A   No, you can't.  It's consumer credit.**
17   Q   Do you have any idea who obtained this
18 credit report?
19   **A   I do not know.  It's 2015.  No.**
20   Q   Could you turn to page PAL105.
21     **MR. POLSBY:** That says AARP something at
22   the top.  Is that account information.
23     **MR. EDELMAN:** That's correct.
24     **MR. POLSBY:** It's right in front of him.
25   Q   Do you recognize this document?

JAMES A. CIESNIEWSKI v.
ARIES CAPITAL PARTNERS, INC.

MATTHEW BLAKE
May 29, 2019

Page 50

```
1    A   No, I do not.  We wouldn't be doing this.
2    Q   Is it an Aries Capital document?
3    A   No.
4    Q   Could you turn to the next page, PAL106.
5    A   Uh-huh.
6    Q   Do you recognize this document?
7    A   I do not.
8    Q   It is not an Aries Capital document?
9    A   Nope.  No, it is not, sir.
10   Q   Does the name Stone Creek Financial mean
11   anything to you?
12   A   I've heard the name.  Not affiliated.
13   Q   Does the name H & S Financial mean
14   anything to you?
15   A   H & S Financial, no.
16   Q   Does the name Kara Graham mean anything to
17   you?  That's K-A-R-A, G-R-A-H-A-M?
18   A   No.
19   Q   What about Levy & Associates, which may
20   have had something to do with Kara Graham?
21   A   Yeah, I know he's an attorney.
22   Q   Is he an attorney in Ohio?
23   A   Yes.
24   Q   Does Levy & Associates collect debts in
25   Indiana as well as Ohio?
```

Page 51

```
1    A   I don't believe so.  I'm not sure.
2    Q   Do you know whether debts that were placed
3    by Aries Capital with Parker Moss may have been sent
4    to Levy & Associates?
5    A   No.
6    Q   Does the name Elatt Hasenmiller mean
7    anything to you?  E-L-A-T-T, the second name,
8    H-A-S-E-N-M-I-L-L-E-R, a law firm.
9    A   Yeah, we may have used them in the past.
10   I'm not sure.
11   Q   Do you know if Elatt Hasenmiller handles
12   Palisades accounts?
13   A   I do not know.
14   Q   Do you know if the area that you used
15   Elatt Hasenmiller for included Indiana?
16   A   No.
17   Q   Does the name Winn Law Group, W-I-N-N,
18   mean anything to you?
19   A   Yeah, he's in California.
20   Q   Is he one of the network attorneys?
21   A   I've used him in the past, sure.
22   Q   Does the name Bowman & Heinz, B-O-W-M-A-N,
23   H-E-I-N-Z mean anything to you?
24   A   No.
25   Q   Does the name Lloyd & McDaniels mean
```

Page 52

```
1    anything to you?
2    A   I know the name.  I know attorney Daniels,
3    but only through conferences.
4    Q   Was Lloyd & McDaniels one of the network
5    attorneys?
6    A   I don't know.
7    Q   Do you know if you used them to collect
8    debts in Indiana?
9    A   I don't know.
10   Q   Does the name Bleecker Brodey mean
11   anything to you?
12   A   No.
13   Q   Do you know how many debts that were
14   placed with Aries Capital by Palisades Collection --
15   A   No.
16   Q   -- pertain to Indiana debtors?
17   A   No.
18   Q   Does your computer system have the ability
19   to identify the accounts that were placed with you
20   by Palisades Collection and pertaining to judgments
21   against Indiana residents?
22   A   No.  They would be archived because they
23   were closed.
24   Q   Do you have the ability to search archived
25   files in on your computer system?
```

Page 53

```
1    A   No longer.  They're not in my office.
2    Q   Where are they?
3    A   I don't have them.  Where are they?
4    Q   Yes.
5    A   Maybe -- I don't know.
6    Q   What does Aries Capital do with a file
7    when it's closed?
8    A   We archive it and get it out of our
9    system.
10   Q   Describe how you archive it?
11   A   I don't know.
12   Q   Is it an electronic function or --
13   A   Yeah.
14   Q   -- or is it paper archive?
15   A   No, it's not paper.  It's data.  But we
16   kind of, you know, you're dealing with public
17   information here.  Personal information.  So we just
18   delete it out of our system.
19   Q   Do you have an information technology
20   manager at Aries Capital?
21   A   I'm sorry, repeat that question, sir.
22   Q   Is there somebody at Aries Capital in
23   charge of information technology?
24   A   Yeah, we outsource that as well.
25   Q   To whom do you outsource it to?
```

JAMES A. CIESNIEWSKI v.
ARIES CAPITAL PARTNERS, INC.

MATTHEW BLAKE
May 29, 2019

Page 54

1     A   Global Networks I believe it is.
2     Q   That's the name of a company?
3     A   Yeah.
4     Q   Do you know where this company is located?
5     A   They're in New York.
6     Q   Have you at any time asked for copies of
7   archived files back from Global Network?
8     A   No, I want it deleted.  I don't want the
9   information out there.
10    Q   When you delete information is any copy
11  retained?
12    A   Not to my knowledge.
13    Q   Do you know if information has been
14  deleted since the filing of the Ciesniewski case in
15  2016?
16        MR. POLSBY: Objection.  Vague as to
17    information.  But answer that if you can.
18    A   I don't know.
19    Q   Do you know if any information related to
20  debtors have been deleted since the filing of the
21  Ciesniewski case?
22        MR. POLSBY: Same objection.  Also
23    foundation.  Answer that if you can.
24    A   Don't know.
25    Q   Has Aries Capital done anything to make

Page 55

1   sure that information is not deleted since the
2   filing for the Ciesniewski case in 2016?
3     A   Don't know.
4     Q   Do you know anyone within your
5   organization who would know that?
6     A   I don't know who would know the
7   Ciesniewski case, aside the paperwork, the filings.
8     Q   For example, did you give an instruction
9   to people in your organization to stop deleting
10  certain data?
11    A   No.  We do it's -- it's kind of automatic.
12    Q   What do you mean by "kind of automatic?"
13    A   The -- I don't know actually.
14    Q   Is there some procedure in place at Aries
15  Capital to periodically purge files?
16    A   Yeah, data.  You don't want it out there.
17    Q   What is the procedure?
18    A   Delete.
19    Q   Is it deleted manually or is there some
20  type of program which causes information to be
21  deleted periodically?
22    A   It's -- I don't know.
23    Q   Do you know who would know?
24    A   Maybe GC Infotech.  I mean I outsource it.
25    Q   Is that the same company that you

Page 56

1   described previously?
2     A   Correct.
3     Q   The last name is Infotech?
4     A   Yes.
5     Q   Do you know what their address or what
6   town they're in?
7     A   No.
8     Q   But they're some place in New York?
9     A   Yes.
10    Q   Do you know what distance they're located
11  from your offices?
12    A   Not sure.
13    Q   If any problem arose with one of the cases
14  that you forwarded to the attorney network is there
15  somebody at Aries Capital whose job it was to deal
16  with the issue?
17        MR. POLSBY: Objection.  Vague.  You can
18    answer that if you can.
19    A   No.
20    Q   Do you still have a relationship with
21  Palisades Collection?
22    A   Yes.
23    Q   Has the volume of business forwarded by
24  Palisades Collection diminished?
25    A   Yes.

Page 57

1     Q   Do you know reason for that?
2     A   FDCPA claims.
3     Q   Can you think of anyone besides yourself
4   at Aries Capital who may have communicated with
5   Parker Moss?
6     A   Just me.  And a former employee.
7     Q   What former employee are you referring to?
8     A   Her name is Kristen.
9     Q   K-R-I-S-T-E-N?
10    A   Correct.
11    Q   Is that her first name or her last name?
12    A   That's her first name.  I don't recall her
13  last name.
14    Q   Do you know when she became a former
15  employee?
16    A   I don't know off the top of my head.
17    Q   Do you know where she is employed or where
18  she is living at present?
19    A   No.
20    Q   Have you or anybody else with Aries
21  Capital kept in touch with Kristen?
22    A   No.
23    Q   In connection with the Ciesniewski
24  lawsuit, do you know if Aries Capital has requested
25  any information that was in the hands of the

Page 58

1   attorneys in the attorney network?
2       A   Could you repeat.
3       Q   In connection with the Ciesniewski case do
4   you know if Aries Capital has requested any
5   information or documents that were in the hands of
6   the attorneys from the attorney network?
7       A   No.
8       Q   It is not done so?
9       A   Pardon?
10      Q   It has not done so?
11      A   No.
12          MR. EDELMAN: Could the court reporter
13   show the witness what has been marked as
14   Exhibit 6.
15          THE WITNESS: I need a break.
16          MR. POLSBY: The witness is taking a break
17   for a minute, is that all right?
18          MR. EDELMAN: Okay.
19          (Short recess.)
20          MR. EDELMAN: Would the court reporter
21   show the witness what has been marked as
22   Exhibit 6.
23          (Exhibit 6 marked for identification and
24   handed to the witness.)
25      A   Yes.

Page 59

1       Q   Could you tell me what this is?
2       A   That is an old -- that's an advertisement.
3       Q   Is this part of your web page?
4       A   I haven't been on my web page.  That's my
5   name.
6       Q   Do you know if you use the web address
7   www.ariesdata.com?
8       A   Yes.
9          MR. EDELMAN: Could the court reporter
10   show the witness what has been marked as
11   Exhibit 7.
12          (Exhibit 7 marked for identification and
13   handed to the witness.)
14          MR. POLSBY: This is document that starts
15   at the top, it says Collection Service
16   Agreement.  That's what you want, right Dan?
17          MR. EDELMAN: Correct.
18      Q   Can you tell me what this document is?
19      A   This is our old -- this is a collection
20   service agreement.
21      Q   Between you and Parker Moss?
22      A   Correct.
23      Q   If you could turn to a page which has
24   00049 at the end.  Do you recognize the signatures?
25      A   The last one?  Yeah, that's -- yeah,

Page 60

1   that's the attorney -- that's Parker Moss' signature
2   I'm assuming.
3       Q   Do you know whether there was an agreement
4   prior to the date of 12/10/10 that appears in this?
5       A   Not that I'm aware of.
6       Q   Did you do business with Parker Moss
7   without a written agreement for some period of time?
8       A   No, we would never do that.
9       Q   Could you turn to page 00044.  Directing
10   your attention to the third paragraph down which
11   deals with the settlement authority.
12      A   Correct.
13      Q   If a settlement offer under 85 percent was
14   received by Parker Moss, this says yes to
15   communicated with client, which is Aries Capital, do
16   you recall getting such inquires from Parker Moss'
17   office?
18      A   No.
19      Q   Was there some person within Aries Capital
20   who was designated to respond to inquiries about
21   settlement?
22      A   It was Kristen.
23      Q   What was Kristen's position?
24      A   She was the attorney network manager.
25      Q   Was she an attorney?

Page 61

1       A   No.
2       Q   Were any of the persons employed by Aries
3   Capital attorneys?
4       A   No.  We're a licensed collection agency
5   and we outsource.
6          MR. EDELMAN: I'd like the court reporter
7   to show the witness the document that has been
8   marked as Exhibit 19.
9          (Exhibit 19 marked for identification and
10   handed to the witness.)
11          MR. POLSBY: Dan, just before we start,
12   this is a document that says Collections
13   Department Asta Funding updated October 31,
14   2017, is that what you want?
15          MR. EDELMAN: It is.
16      Q   My first question is, have you ever seen
17   this document before?
18      A   No.
19      Q   Have you ever seen any prior version,
20   prior to October 31, 2017, of this document?
21      A   No.
22          MR. EDELMAN: I'd like the court reporter
23   to show the witness what has been marked as
24   Exhibit 1.
25          (Exhibit 1 marked for identification and

JAMES A. CIESNIEWSKI v.
ARIES CAPITAL PARTNERS, INC.

MATTHEW BLAKE
May 29, 2019

Page 62

1    handed to the witness.)
2        MR. EDELMAN: This is the plaintiff
3    servicing agreement.
4        A    Okay.
5        Q    Have you ever seen this document before?
6        A    I believe so.
7        Q    Do you recall under what circumstances you
8    saw it?
9        A    Our initial due diligence process.
10       MR. EDELMAN: Could the court reporter
11   show the witness what has been marked as
12   Exhibit 2.
13       (Exhibit 2 marked for identification and
14   handed to the witness.)
15       A    Okay.
16       Q    Have you ever seen this document before?
17       A    I don't remember.  It's old it looks like.
18       MR. EDELMAN: Let me take a few minutes
19   and see what I have left.
20       (Short recess.)
21       Q    Does Aries Capital have any manuals that
22   it uses in its business?
23       A    I'd have to check.
24       Q    When people from Asta Funding or Palisades
25   Collection visited Aries Capital, did they provide

Page 63

1    any reports of what they observed during their
2    visit?
3        A    No.  We were just audited.
4        Q    You didn't get the results of the audit or
5    report?
6        A    I didn't.
7        Q    Do you know if anybody else at Aries
8    Capital did?
9        A    I'd have to check.
10       Q    Who would you check with to find something
11   like that out?
12       A    I'd have to check.
13       MR. EDELMAN: I'd like the reporter to
14   show the witness what been marked as Exhibit
15   27.
16       (Exhibit 27 marked for identification and
17   handed to the witness.)
18       A    Okay.
19       Q    Taking a look at Exhibit 27, is a Great
20   Seneca file handled by an Indianapolis law firm
21   called Bleecker Brodey & Andrews.  Is there any way
22   you could determine whether this was a file that
23   Aries Capital was involved with?
24       MR. POLSBY: Object to foundation on that.
25       A    My attorney objected to that.

Page 64

1        MR. POLSBY: Answer if you can.
2        A    I have no idea, no.  No idea.
3        Q    Do you have some kind of an index of all
4    the law firms that have been part of the attorney
5    network?
6        A    My attorney network?
7        Q    Yes.
8        A    I do.
9        Q    Aries Capital's?
10       MR. POLSBY: Did you answer that?
11       A    I do.
12       Q    In what form is this index?
13       A    I could give it to you in data, but it
14   needs to come to you securely if you have a website
15   that's encrypted.
16       MR. POLSBY: Before you agree to hand that
17       over we have an objection pending on that issue
18       and the Court has not ruled on whether that's
19       discoverable yet.
20       Q    But it exists.  Are attorneys who are in
21   the network ever contacted by title insurance
22   companies with respect to judgments against people?
23       A    I believe so.  It is outsourced.
24       Q    When you it's outsourced, is there
25   somebody who is in charge of handling inquires from

Page 65

1    a title insurance company that would like to know
2    what it takes to get a judgment off of somebody's
3    title?
4        A    That's usually pro forma.
5        Q    Who handles it?
6        A    The attorney.
7        Q    The network attorney such as Parker Moss?
8        A    Correct.
9        Q    Does Aries Capital ever communicate with
10   the title company?
11       A    It would be referred out.  Yeah, it would
12   be referred out.
13       Q    To the network attorney?
14       A    Correct.
15       Q    Are network attorneys ever told to file
16   appearances in cases without taking action to
17   proceed with the enforcement of judgment?
18       A    Whatever's statutory in that state.
19       Q    I'm sorry, whatever is statutory?
20       A    Yeah, statutory.  Your normal procedure
21   before doing an execution or lien.
22       Q    So you just tell the local attorney to do
23   whatever local procedure calls for?
24       A    Correct, because each state is different.
25       Q    Other than what you've testified to do you

JAMES A. CIESNIEWSKI v.
ARIES CAPITAL PARTNERS, INC.

MATTHEW BLAKE
May 29, 2019

Page 66

1  provide any other instructions to your network
2  attorney?
3      A   Yeah, to do their job.
4      Q   Nothing more specific?
5      A   Just to see how their liquidation rates
6  are in the collection business.
7      Q   How does Aries Capital keep track of
8  liquidation rates of each local attorney --
9      A   We go month to month.  And it's a monthly
10  remittance.  And we send it out -- our New York
11  attorney handles sending out the funds.
12      Q   The New York attorney is Houselanger?
13      A   Correct.
14      Q   Do you have a spreadsheet or a program
15  that Aries Capital uses to monitor the liquidation
16  rates of network attorneys?
17      A   No.  I eyeball it.
18      Q   So you have the monthly remittances and
19  you compare it to what, the placements?
20      A   Yes.  But there's no system.
21      Q   Do you recall any communications with Levy
22  & Associates or Kara Graham with respect to
23  inquiries from title companies?
24      A   I don't recall.
25      Q   Do you know what portion of the judgments

Page 67

1  that Aries Capital places with network attorneys are
2  resolved with the result of title company activity?
3      A   I really don't know.
4      Q   Is an inquiry from a title company
5  something that's common or unusual?
6      A   Very unusual.
7          MR. EDELMAN: I do not have any other
8      questions.
9          MR. VELDE: Can we take a five minute
10      break, I want to look at some documents.
11      (Short recess.)
12  BY MR. VELDE:
13      Q   Mr. Blake, my name is Peter Velde.  I
14  represent Parker Moss, P.C. and Parker Moss.
15          MR. VELDE: Dan, could you get to Exhibit
16      13, the spreadsheet here that we were talking
17      about.
18      (Exhibit 13 in front of witness.)
19      Q   Now previously you testified this would
20  have been the information that you would have
21  received from the Palisades entities; is that
22  correct?
23      A   Correct.
24      Q   And then is this information, after you do
25  your clean up, is what is sent to Parker Moss?

Page 68

1      A   Yeah, we clean it up a little bit and send
2  it over.
3      Q   As I look at the first page it has the
4  Plaintiff's name, it has Centurion Capital; is that
5  correct?
6      A   In that case, yes.
7      Q   It also gives of the cause number and it
8  gives the court name; is that correct?
9      A   Correct.
10      Q   Then it gives the original creditor, in
11  that is Discover Financial Services?  You can go
12  ahead and look at the document and follow along.
13      A   It would be Discover.
14      Q   Then it has Mr. Ciesniewski's name?
15      A   Correct.
16      Q   It has his address and it has his place of
17  employment; is that correct?
18      A   Correct.
19      Q   Nowhere in that document with respect to
20  Mr. Ciesniewski is there any indication that
21  Palisades is the owner of the judgment at that point
22  in time; is that correct?
23      A   No, we provided it.
24      Q   How did you provide it to Mr. Moss?
25      A   Through data format.

Page 69

1      Q   That would have been this piece of paper?
2      A   Correct.
3      Q   And nowhere --
4      A   No, not this piece of paper.  This is the
5  original placement data.
6      Q   To Mr. Moss, right?
7      A   -- call data -- no, this is not.  I don't
8  believe this is the data.  Hold on.  Was this
9  provided by us, do you know?  Because it looks like
10  a spreadsheet.  I don't know.  I really don't.
11      Q   If you go to the page that's marked at the
12  lower left-hand corner 00038.
13      A   Thirty-eight, I got it.
14      Q   That pertains to Mr. Norman, does it not?
15      A   I'm sorry, 00038.
16          MR. POLSBY: 00038.
17      A   A Mr. Norman?
18      Q   Darryl D. Norman?
19      A   I don't see that on this piece of paper.
20          MR. POLSBY: Right here.
21      A   Oh, okay, yes.
22      Q   It shows that the original creditor in
23  that was Providian Bank; is that correct?
24      A   Right, correct.
25      Q   If you go down, the plaintiff's name in

JAMES A. CIESNIEWSKI v.
ARIES CAPITAL PARTNERS, INC.

MATTHEW BLAKE
May 29, 2019

Page 70

1    that case, if you go to the next couple of pages,
2    like 00040, is Great Seneca; is that correct?
3        A   Yes.
4        Q   Again, with respect to Mr. Norman there is
5    nothing on this document that shows that Palisades
6    or any of the Palisades entities own the debt that
7    was owing by Mr. Norman; is that correct?
8        A   **If this was the original placement?**
9        Q   If it was, I'm asking you the question.
10       A   **It doesn't say that.**
11       Q   It doesn't say it at all?
12       A   **Not in this paperwork. However we always**
13   **put on the original assignee. I mean the current**
14   **creditor. Is there a current creditor on there?**
15   **It's a plaintiff name. Okay, any other questions?**
16       Q   So there's no current creditor on that, is
17   there, on that document?
18       A   Correct.
19       Q   After Mr. Ciesniewski was represented by
20   counsel did Parker Moss request assignment of
21   judgments from your company?
22       A   I believe so.
23           MR. VELDE: Now I'm going to hand you
24   what's been marked, I think it's Exhibit 14.
25   You should have it over here.

Page 71

1           (Exhibit 14 marked for identification and
2        handed to the witness.)
3        Q   I'm going to ask you if you can identify
4    those documents.
5        A   **Yeah, it's the assignment of the**
6    **judgments. Palisades Acquisition XV and going to**
7    **Centurion Capital, going to Palisades XV.**
8        Q   Do you know whether this was the document
9    that was provided to Mr. Moss?
10       A   I believe so.
11       Q   If you went back and looked at your
12   records would that document have been provided to
13   Mr. Moss on or about the 26th of August of 2015, if
14   you can recall?
15       A   I didn't see if I have -- oh, we tried to
16   look for it yesterday by the way.
17           MR. POLSBY: Hold on. There's no question
18       pending right now.
19           MR. VELDE: I have no other questions.
20   BY MR. BOYLE:
21       Q   Mr. Blake, my name is John Boyle. I
22   represent Asta Funding and the two Palisades
23   defendants.
24       A   Uh-huh.
25       Q   I just have a handful of questions just to

Page 72

1    try to get a little clarity on the things you
2    testified about earlier today.
3        A   Okay.
4        Q   You talked about there being quarterly
5    audits?
6        A   Uh-huh.
7        Q   Is that right?
8        A   Yes.
9        Q   Where representatives of Asta, Palisades
10   would come to your office and conduct an audit; is
11   that right?
12       A   Yes.
13       Q   What was the purpose of those audits?
14       A   **Usually just general cases just to see**
15   **what was being done on them. And then we had a**
16   **yearly financial audit.**
17       Q   So if I follow you right, the quarterly
18   audit would be a review of certain number of files?
19       A   Right.
20       Q   Just see how they were being handled?
21       A   Right.
22       Q   And then there was an annual audit on
23   financials?
24       A   Financials.
25       Q   I suppose that relates to whether there

Page 73

1    need be a true up or some reconciliation --
2        A   Correct.
3        Q   -- of what was owed; is that correct?
4        A   Yes.
5        Q   You talked about doing a due diligence and
6    getting certain documents from Palisades about your
7    servicing agreements and assignments and whatnot.
8    Could you describe for us what your due diligence
9    was?
10       A   **Well basically we look at all the**
11   **assignment that they had. If we knew it was with**
12   **Palisades, then it was less due diligence more with**
13   **-- but the initial contract you mean?**
14       Q   Yes.
15       A   **Reviewing the contract, meeting with Gary**
16   **and his father, and his son. Oh, and the CFO at the**
17   **time. The intern CFO, Charles, or something like**
18   **that.**
19       Q   Was this to satisfy yourself --
20       A   Yes.
21       Q   -- that you would be proceeding with
22   soundly basis --
23       A   Yes, exactly.
24       Q   -- in collecting on judgments?
25       A   Correct.

Page 74

```
 1    Q   And that the proper paperwork was in
 2  place?
 3    A   Absolutely, yes.
 4    Q   That you knew who the current owner was?
 5    A   Yes.
 6    Q   As you know in this lawsuit involving
 7  Mr. Ciesniewski is a situation where he was sued in
 8  the name of a former creditor and not the Palisades
 9  entity, that's the basis for their FDCPA claim, do
10  you understand that?
11    A   Yes.
12    Q   Do you have any understanding of how those
13  circumstances occurred?
14    A   Well, the caption doesn't change.  Your
15  caption is your caption.  So you got to keep the
16  caption, otherwise the court clerk or whatever when
17  he files a satisfaction, okay, it needs to go under
18  the same entity.
19    Q   When the file was sent to Parker Moss on
20  Ciesniewski who was the current owner of the
21  judgment?
22    A   It was Palisades XV I think.
23    Q   What did Aries do to make Mr. Moss aware
24  that they were the current owner?
25    A   Yeah, again, we notified because you need
```

Page 75

```
 1  to have the assignee, and we're going by New York
 2  law, notify them of the assignee.
 3    Q   I understand Ciesniewski was in Indiana,
 4  right?
 5    A   Yeah.
 6    Q   I'm trying to be clear here, what did you
 7  notify Mr. Moss of with respect to the current
 8  owner?
 9    A   Either Palisades XV or XVI I believe.
10    Q   A certain Palisades entity was the current
11  owner?
12    A   Right.
13    Q   How was that communicated to Mr. Moss?
14    A   Via e-mail.
15    Q   Then what was Mr. Moss supposed to do with
16  that information?
17    A   He was supposed to -- when you normally
18  send a 30 day demand, right, you send a 30 day
19  demand and include the original creditor, current
20  creditor and current assignee.
21    Q   So he was supposed to have notified
22  Mr. Ciesniewski that the current owner --
23    A   Right.
24    Q   -- was Palisades?
25    A   In some sort of document, yeah.  Usually
```

Page 76

```
 1  in the -- no, we ask for the dunning -- are you done
 2  -- the initial demand.
 3    Q   So let me back you up.  So it's your
 4  understanding Parker Moss was to have notified the
 5  debtor in the initial dunning letter that the
 6  current owner was a Palisades entity?
 7    A   Correct.
 8    Q   And then Mr. Moss took legal action in the
 9  court to enforce the judgment?
10    A   Right.
11    Q   Was he also to notify the court that a
12  Palisades entity was a current owner?
13          MR. POLSBY: I'm going to object to that
14    on foundation because obviously this witness is
15    not a lawyer.  But answer that to the extent
16    you can, please.
17    A   Rephrase the question.
18    Q   After the dunning letter goes out and then
19  if there's legal action taken to enforce the
20  judgment in court, was Parker Moss supposed to
21  notify the Court of the current owner of the debt?
22          MR. POLSBY: Same objection.  Answer that
23    if you can, please.
24    A   You go by your -- the law in your state,
25  you know.  What you have to do based on -- in New
```

Page 77

```
 1  York it's a CPLR, okay.  There's guidance of how you
 2  need to notify it before you proceed into the -- so
 3  it's entirely up to our outsourced attorney.
 4    Q   So you relied upon Parker Moss to be aware
 5  of the law --
 6    A   Correct.
 7    Q   -- and know what to do?
 8    A   Correct.
 9    Q   And know what procedure to follow?
10    A   Yes.  I'm not an attorney.
11    Q   So it's your testimony, if I'm following
12  you right, that you advised Parker Moss that a
13  Palisades entity was the current owner?
14    A   Yes.
15    Q   Then you were relying upon Parker Moss to
16  proceed in the proper fashion in court?
17    A   Correct.
18          MR. BOYLE: That's all I have, thank you.
19          MR. POLSBY: Plaintiff's attorney has a
20    right to follow-up.
21          MR. VELDE: I have a couple of follow-ups
22    as well.
23  BY MR. EDELMAN:
24    Q   Could the witness look at Exhibit 14
25  again, the two assignments.
```

Page 78

```
1        (Cross-talk.)
2     Q   -- to an attached Exhibit A, do you know
3  what that is?
4     A   Yeah, these are assignments of judgment.
5     Q   I understand.  Each assignment says that
6  accounts referenced in the attached Exhibit A.  Have
7  you ever seen Exhibit A?
8     A   I have not.
9     Q   Do you have any idea what it is?
10    A   It's basically what you'd see on any other
11 exhibit on a placement.
12    Q   Can you describe what Exhibit A is?  Is it
13 a spreadsheet, is it a data file?
14    A   It's a TXT file.
15    Q   But you've never seen this TXT file?
16    A   No.
17    Q   Do you know who has it?
18    A   No.
19    Q   How did you find out that Parker Moss has
20 been taking action in the name of Centurion Capital
21 of Great Seneca?
22    A   Based on the assignments.
23    Q   Parker Moss appears to have taken legal
24 action without showing that the debts have been
25 transferred to a Palisades Acquisition entity.  How
```

Page 79

```
1  did you find that may have occurred?
2     A   I don't know.
3     Q   Did you find out for the first time as a
4  result of the Ciesniewski lawsuit?
5     A   I believe so.
6     Q   Has there been any other instances in
7  which any action was taken to collect or revive a
8  judgment while using the name of owners such as
9  Great Seneca or Centurion Capital?
10       MR. POLSBY: I'm going to object that one.
11    That's a disputed discovery issue that the
12    Court has not ruled on yet so I'm going to
13    instruct the witness not to answer that
14    question.
15    A   I will not answer that I guess based on
16 counsel.
17    Q   Were you the person that first found out
18 about the problem with Parker Moss or was it
19 something else with Aries Capital?
20    A   Well, we were served.
21    Q   That was the first inkling you had that
22 Parker Moss was still acting in the name of
23 Centurion or Great Seneca?
24    A   Yes.
25    Q   Do you have a contact person at Asta
```

Page 80

```
1  Funding?
2     A   Lorry Smith.
3     Q   Anybody else?
4     A   That's who we deal with.
5     Q   Is there a contact at Aries Capital with
6  Levy & Associates?
7     A   Me.
8     Q   Nobody else?
9     A   Maybe -- it's usually me.
10    Q   You have no recollection of transferring
11 Indiana debt to Levy & Associates?
12    A   No.
13       MR. EDELMAN: I have no other questions.
14       MR. VELDE: Could you hand him that
15    spreadsheet back that's part of Exhibit 13.
16       MR. POLSBY: Witness has Exhibit 13.
17 BY MR. VELDE:
18    Q   Mr. Moss was notified of accounts or
19 judgments that he was to collect on by e-mail from
20 your company; is that correct?
21    A   Correct.
22    Q   That would have come in the form of some
23 type of spreadsheet or document; is that correct?
24    A   Correct.
25    Q   Do you have any reason to doubt that that
```

Page 81

```
1  is the document that was served on Mr. Moss when the
2  Ciesniewski --
3     A   I can't recollect because we kind of
4  changed our systems a little bit.
5     Q   If I told you that that was the document
6  Mr. Moss got from you, would you have any facts to
7  say that that that wasn't the document?
8     A   I'd have to look.
9     Q   What would you have to look at?
10    A   Old e-mails, I guess.  First of all, it's
11 three years ago.  So the person, that was Kristen,
12 she would put -- send the data.  We have a file that
13 we put together and we send it over.
14    Q   Would that be in any form of your
15 collection notes?
16    A   Yes.
17       MR. VELDE: Mark this.
18    (Exhibit 29 marked for identification, as
19    of today's date, and handed to the witness.)
20    Q   Can you identify that, Mr. Blake?
21    A   Yeah, this looks...
22    Q   What is that document?
23    A   This would be our notes.
24    Q   You can go ahead and sit down, sir.
25    A   I'd rather stand.
```

Case 1:16-cv-00817-JPH-TAB   Document 165-7   Filed 08/30/19   Page 23 of 27 PageID #:
2434
JAMES A. CIESNIEWSKI v.
ARIES CAPITAL PARTNERS, INC.
MATTHEW BLAKE
May 29, 2019

Page 82

1    Q   That's your notes with respect to
2    Mr. Ciesniewski?
3    A   I don't know.
4    Q   Well, take a look at the third line down.
5        MR. BOYLE: What Exhibit number is this?
6        THE COURT REPORTER: 29.
7    A   Third line down.  Oh, yeah that's -- James
8    Ciesniewski, right.
9    Q   Now I want you to take a look through that
10   entire document and tell me whether there's anything
11   in that document that indicates that Palisades or
12   any of the Palisades entities is the owner of the
13   Ciesniewski --
14   A   It would be on the screen shot.
15   Q   And the screen shot is what we've been
16   looking at here, that --
17   A   No.  I could send that to you.
18   Q   But there's nothing here that indicates
19   that it was placed with Mr. Moss saying that
20   Palisades was the owner?
21   A   It would be on the screen shot.  These are
22   just comments.  It's a separate tab of activity.
23   Q   I think you testified that you had no
24   knowledge whether Mr. Moss conveyed any offers of
25   settlement to your office?

Page 83

1    A   On this particular -- I can't.  Is there
2    anything in the notes?
3    Q   I'm just asking you, you have no
4    recollection?
5    A   I don't have any recollection.
6    Q   Those would have gone through Kristen?
7    A   Either Kristen or Anthony, who is no
8    longer with -- either of them are not with our
9    company.
10   Q   If you look, you kind of go down towards
11   the bottom you'll see there are several lines there
12   that are dated 8/26/2015.
13   A   Second page?
14   Q   First page.
15   A   First page, okay.  And I'm going line 15.
16   Just give me -- employment provided by client, is
17   that what you're talking about?
18   Q   Go all the way down to the bottom, and
19   it's 8/26/2015?
20   A   Okay.  Which one am I looking at.
21   Q   The first one says "Previous judgment."
22   A   C-Pro was --
23   Q   Go down to the one where it says, "No
24   assignee given in the plaintiff name."
25   A   Oh, okay, you could say that.  But that is

Page 84

1    just -- no assignee given in the plaintiff name.
2    Plaintiff name.
3    Q   The next line says "e-mail client for
4    COT."  What is "COT?"
5    A   Chain of title.
6    Q   That would have been the two assignment
7    documents --
8    A   Yeah, yeah.
9    Q   Then in August of 2015 those were the ones
10   that were sent to Mr. Moss; is that correct?
11   A   Correct.
12       MR. VELDE: I have no other questions at
13   this time.  Dan, I'll be happy to make a copy
14   and send to you but I think it's in somebody's
15   production document.
16       MR. POLSBY: I think I produced this.  I
17   think Aries produced.
18       MR. EDELMAN: Does the document that we're
19   talking about have any kind of marking on it?
20       MR. VELDE: Mine does not.  I don't have a
21   Bates stamp on it.
22       MR. EDELMAN: What exactly is it a copy
23   of?
24       MR. VELDE: At the very top it has Debtor.
25   It has date.  It has comment.  It has user name

Page 85

1    and C time.  And it's the collection notes from
2    Aries, or their input notes of Aries with
3    respect to Mr. Ciesniewski debt.  And I pulled
4    this from their production request.
5        MR. EDELMAN: Okay.  I have a question for
6    the witness about this.
7    BY MR. EDELMAN:
8    Q   Is there a similar set of notes for all
9    Palisades accounts that you handle?
10   A   Yes, if we have it, sure.
11   Q   So there's one for each file, for example,
12   that you sent to Parker Moss?
13   A   I believe so.
14   Q   Do this file still exist?
15   A   Not sure.
16   Q   Who is Anthony that you referred to?
17   A   He's a former employee.
18   Q   What's his the full name?
19   A   Mazuka(sic).
20   Q   Could you spell the last name?
21   A   No.  How do you spell Mazuka.  I just know
22   his name is Mazuka.
23   Q   If you wanted to find him how would you go
24   about it?
25   A   He's -- I wouldn't even know.  He's a

JAMES A. CIESNIEWSKI v.
ARIES CAPITAL PARTNERS, INC.

MATTHEW BLAKE
May 29, 2019

Page 86

1    former employee.
2      Q   What position did he hold with Aries
3    Capital when he worked for you?
4      A   He was a collector.
5      Q   Aries Capital employed collectors?
6      A   Yeah, I mean to take inbound calls. We're
7    an agency. We're a collection agency. Palisades is
8    not our only client.
9      Q   With respect to the Palisades Collection
10   business, did Aries Capital do anything that
11   anything that would cause a consumer to call it?
12     A   No -- through our attorney. Okay, so
13   through our attorney, Houselanger & Associates, it
14   would go to -- and then we'd outsource it. So
15   basically we're a middle man.
16     Q   I understand. The outsourcing would be to
17   the attorney network, correct?
18     A   Correct.
19     Q   With respect to the Palisades Collection
20   business, Aries Capital did not place calls to
21   debtors, correct?
22     A   Did we? Yeah, yes. At one point, sure.
23     Q   You did place calls?
24     A   Not for Palisades though.
25     Q   Let's just confine ourselves to the

Page 87

1    Palisades Collection --
2      A   Okay.
3      Q   Did Aries Capital place telephone calls to
4    consumers with respect to the Palisades
5    Collection --
6      A   No, not outbound calls.
7      Q   Did you send any letters or e-mails or
8    other written communications to debtors with respect
9    to the Palisades Collection file?
10     A   It would have been through our attorney.
11     Q   Not directly, correct?
12     A   To the best of my knowledge if we're
13   talking just about Palisades, no.
14     Q   And again, with respect to Palisades
15   Collection were the attorneys required to identify
16   Aries Capital?
17     A   No, we're not part of the -- we're not the
18   assignee.
19         MR. EDELMAN: I have no other questions.
20         MR. BOYLE: I just have a couple
21   follow-up. Again, I'm just trying to get some
22   clarity.
23   BY MR. BOYLE:
24     Q   Mr. Velde asked you about Exhibit 13,
25   which was this spreadsheet.

Page 88

1      A   Right.
2      Q   Which relates to Mr. Ciesniewski and
3    Mr. Norman, do you recall that?
4      A   Yeah.
5      Q   He got you to note that nowhere on this
6    document, to the extent this reflects information
7    that may have been transmitted, is there any
8    reference to Palisades, correct?
9      A   Right.
10     Q   You made the statement that the name
11   Palisades would have been reflected on the screen
12   shot?
13     A   Yeah.
14     Q   Do you recall that testimony?
15     A   Yeah, I can provide that for you.
16     Q   What did you mean by that? What is the
17   screen shot?
18     A   It would be just the main client screen,
19   consumer screen I should say. And it would have the
20   original, this, this and this. The three lines.
21     Q   So is it that communications to Parker
22   Moss that was supposed to advise them that these
23   debts were owned by Palisades?
24     A   No, it should have been in the
25   spreadsheet.

Page 89

1      Q   Who would have been responsible for
2    getting that spreadsheet to Parker Moss with
3    Palisades on there?
4      A   Either Kristen or now Anthony. Whatever
5    it says place with Parker Moss, whatever date that
6    is.
7      Q   So Kristen or Anthony with Aries?
8      A   Right, with Aries.
9      Q   Do you know why, assuming Exhibit 13 is
10   the spreadsheet that was sent to Parker Moss with
11   the information on those two accounts, do you know
12   why there is no reference to Palisades on here?
13     A   There should be.
14     Q   Do you know why there wasn't?
15     A   I have no idea.
16     Q   That would have been Kristen or Tony?
17     A   Yeah, Anthony.
18     Q   So two former employees at Aries?
19     A   Uh-huh.
20     Q   Is that a yes?
21     A   Yes.
22     Q   At the time these files were placed with
23   Parker Moss, which are in Exhibit 13, Aries would
24   have known obviously that those files were now owned
25   by a Palisades entity; is that correct?

JAMES A. CIESNIEWSKI v.
ARIES CAPITAL PARTNERS, INC.

MATTHEW BLAKE
May 29, 2019

---

Page 90

1    A    Yes.
2    Q    Would Aries at this time have known that
3  Great Seneca and Centurion really no longer existed?
4    A    Oh, yeah.  Yeah.
5        MR. BOYLE: I have nothing further.  Thank
6  you.
7        MR. POLSBY: Anything else?
8        MR. VELDE: I don't have anything.  Dan?
9        MR. EDELMAN: Yes.
10  BY MR. EDELMAN:
11   Q    Going back to Exhibit 13, is there a
12  dating field on Exhibit 13 which is supposed to
13  indicate the current owner of the debt?
14   A    Yes, there should be.
15   Q    Where?
16   A    I don't see.  Maybe it was the import.
17  Our export will see it.
18   Q    Who will see it?
19   A    Our export will see it.  Our export file
20  would see it.
21   Q    How does the export file differ from
22  Exhibit 13?
23   A    It has the original creditor name in it.
24   Q    Where?
25   A    Not on this exhibit.

---

Page 91

1    Q    Where would it be in the export file?
2    A    It would be on a column, it's own column.
3    Q    Would you ever send a group of debts to a
4  network attorney, some of which were owned by
5  Palisades Acquisition and some of which were owned
6  by somebody else?
7    A    Can we stick to Palisades?
8    Q    Well my question is would you ever send a
9  single file containing both Palisades accounts and
10  other accounts?
11   A    No.
12   Q    Were the export files preserved in any
13  manner?
14   A    Not aware.
15   Q    Who would know that?
16   A    I would have to look.
17   Q    Could you identify by name any person who
18  you would think would have that information?
19   A    Matt Blake.
20   Q    Other than yourself there's no data
21  processing person who would know whether the export
22  file still existed?
23   A    GC Infotech.
24   Q    Who do you deal with at GC Infotech?
25   A    Our main guy is Ryan.

---

Page 92

1    Q    What's his name?
2    A    Ryan.
3    Q    Is that a first name or a last name?
4    A    First name.
5    Q    Do you know his last name?
6    A    I don't.
7    Q    Do you have a telephone number or any
8  other information to locate GC Infotech?
9    A    Not on me.
10       MR. EDELMAN: I have no other questions.
11       MR. VELDE: I just have a couple of
12  small ones.
13  BY MR. VELDE:
14   Q    You said your export file would show the
15  original creditor; is that correct?
16   A    Yeah.
17   Q    Does not Exhibit 13 show the name of the
18  original creditor on that spreadsheet?
19   A    The original creditor?
20   Q    Yes.  Doesn't it show Discover Card?
21   A    Yes.
22   Q    Doesn't it show for Mr. Norman, Providian
23  Bank?
24   A    Just bear with me.
25   Q    Sure, not a problem.

---

Page 93

1    A    Yes, it does.
2    Q    Now if you take a look at what's been
3  marked as Exhibit 29.
4    A    Yes.
5    Q    If you take a look at an entry dated 10/14
6  of 2014.
7    A    Uh-huh.
8    Q    It says, "File placed with Parker Moss?"
9    A    Correct.
10   Q    And that is the time --
11   A    That was Anthony.  It was placed by
12  Anthony.
13   Q    It was placed by Anthony with Mr. Moss; is
14  that correct?
15   A    Yes.
16       MR. VELDE: Thank you, sir.
17       MR. BOYLE: A couple of follow-ups.  It
18  will be quick.
19  BY MR. BOYLE:
20   Q    With respect to Exhibit 13, is it your
21  testimony that should have contained the current
22  creditor?  The current owner of the --
23   A    That is my testimony, absolutely.
24       MR. POLSBY: You have to let him finish
25  the question.

---

Page 94

1    Q    That you believe that the export file
2    would actually show the current creditor?
3    A    **Correct.**
4    Q    Which was a Palisades entity at that time?
5    A    **Right.**
6    Q    One final question, except I just lost it.
7    Hang on one minute, it's come to me.
8    A    **You left off with Palisades.**
9    Q    When files or judgments or collection
10   accounts were sent to Parker Moss, for instance, is
11   it your testimony that you would not mix multiple
12   current creditors in that, you would just send just
13   at one time and one e-mail, only files related to a
14   particular creditor?
15   A    **Yes. To the best my recollection, yes.**
16   **It would be just -- it would be just that entity,**
17   **for tracking purposes.**
18   Q    So for instance when the information was
19   sent for Mr. Ciesniewski and Mr. Norman any other
20   accounts that would have been transmitted at that
21   time would have been from a Palisades entity?
22   A    **Yes, right.**
23   Q    And not some other creditor that you would
24   be doing business with?
25   A    **I'm pretty sure that that one off made it**

Page 95

1    in there, but no.
2         MR. BOYLE: Thank you, that's all.
3         MR. POLSBY: Anyone else?
4         MR. EDELMAN: I have no other questions.
5         MR. POLSBY: I'm going to reserve
6    signature and the deposition's over.
7         THE COURT REPORTER: Are you ordering,
8    Mr. Velde?
9         MR. VELDE: Yes, I am.
10        THE COURT REPORTER: Mr. Boyle, are you
11   ordering too?
12        MR. BOYLE: Yes.
13        (Time noted: 2:20 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 96

1              C E R T I F I C A T E
2    STATE OF NEW YORK      )
3    COUNTY OF WESTCHESTER  )  SS.:
4
5         I, EDUARDO LAMELA, a Notary Public within
6    and for the State of New York, do hereby certify:
7         That the witness whose examination is
8    hereinbefore set forth was duly sworn and that such
9    examination is a true record of the testimony given
10   by that witness.
11        I further certify that I am not related to
12   any of the parties to this action by blood or by
13   marriage and that I am in no way interested in the
14   outcome of this matter.
15        IN WITNESS WHEREOF, I have hereunto set my
16   hand this    day of    , 2019.
17
18        _____
19              EDUARDO LAMELA
20
21
22
23
24
25

Page 97

1                  I N D E X
2    WITNESS              EXAMINATION BY        PAGE
3    Matthew Blake    Mr. Edelman        4, 77, 85, 90
4                     Mr. Velde          67, 80, 92
5                     Mr. Boyle          71, 87, 93
6
7              E X H I B I T S
             (Retained by the Court Reporter)
8    DEPOSITION                              PAGE
9    Exhibit 1, Amended and Restated Servicing
     Agreement dated May 19, 2008.....................61
10
11   Exhibit 2, Subservicing Agreement dated
     March 2, 2007....................................62
12
13   Exhibit 5, Defendants' Responses to
     Plaintiffs' First Discovery Requests.............8
14
15   Exhibit 6, Aries web page advertisement..........58
16   Exhibit 7, Collection Service Agreement..........59
17   Exhibit 13, TXT file.............................24
18   Exhibit 14, Assignment of judgments.............71
19   Exhibit 19, Collections Department Asta
     Funding updated October 31, 2017................61
20
21   Exhibit 27, Document entitled Great Seneca
     Financial Corp. v. Carol J. Lilly...............63
22   Exhibit 29, Aries Capital Notes..................81
23
24
25

JAMES A. CIESNIEWSKI v.
ARIES CAPITAL PARTNERS, INC.

MATTHEW BLAKE
May 29, 2019

Page 98

1  A C K N O W L E D G E M E N T  O F  D E P O N E N T

2

3  STATE OF NEW YORK)

4                                    : SS
    COUNTY OF NEW YORK)

5

6

7          I, MATTHEW BLAKE, hereby

8  certify that I have read the transcript of my

9  testimony taken under oath in my deposition of

10  May 29, 2019; that the transcript is a true,

11  complete and correct record of what was asked,

12  answered and said during this deposition, and that

13  the answers on the record as by me are true

14  and correct.

15

16          _____

17                    MATTHEW BLAKE

18

19  SUBSCRIBED AND SWORN BEFORE ME

20
    THIS 20TH DAY OF  JUNE, 2019.
21

22

23  _____

24          NOTARY PUBLIC

25  My Commission Expires:_____